CHRISTOPHER MOONEY v. GEORGE MOONEY et al., Appellants.

Division One, June 29, 1912.

1. **ILLEGITIMATE CHILD:** Recognized as Member of Family: Statute. Where the issue is whether the plaintiff was the child of the testator, the fact that he was treated and recognized as a child does not bring him within the provisions of Sec. 341, R. S. 1909, which provides that "if a man, having by a woman a child

Mooney v. Mooney.

or children, shall afterwards intermarry with her and shall recognize such child or children to be his, they shall thereby be legitimated"; for, though the testator intermarried with the child's mother, yet if the child was not in fact his, the statute does not apply, since it applies only when the man has a child by the woman he married.

2. **PARENT AND CHILD: Burden of Proof: Pretermitted Heir.** The burden of proof is upon a plaintiff, who claims as a pretermitted heir in spite of the testator's will which omits all reference to him, to establish the relationship between him and the testator, and to show that he was in fact testator's son, although his mother and testator intermarried and he was ever afterwards by them recognized as a member of their family and treated as were their other children.

3. ——: **Relationship: How Established: Circumstances.** The relationship of father and child can often be established only by a combination of words and facts indicating the relationship, such as the marriage of the admitted mother to the man at the time the child was begotten or born, that the child has always borne the name of such man, was treated, maintained and educated as his child, and uniformly recognized and received in society as his child, and so acknowledged by other members of the family. But the fact of paternity cannot be established by circumstances which are perfectly consistent with direct, uncontradicted and unimpeached testimony that the fact does not exist.

4. ——: ——: **Prima Facie Case: Due to Kindness.** Where there is no evidence tending to prove that it was claimed by any one that the man was the father of the child at the time the child was begotten or born, and there is no direct evidence tending to show that the man ever recognized or acknowledged the child as being his child; and there is positive evidence that the mother was in Ireland when the child was begotten, that she came to this country and in a week after the child was born and christened with the surname of its reputed father in Ireland, the woman married the man and thereafter children were born to them and the child was kept in their family, educated and maintained as a member of it, and the man was never heard to say it was his child, and in his will mentioned the younger children but did not mention said child, a prima facie case is not made out in favor of such child, but the man's conduct towards the child is to be attributed to his kindness and charity, and to his desire to hide the dishonor of the woman whose conduct he had condoned.

Appeal from Saline Circuit Court.—*Hon. Samuel Davis*, Judge.

REVERSED AND REMANDED (*with directions*).

*A. F. Rector* and *A. B. Hoy* for appellants.

(1) The issue in this case is as to whether or not the plaintiff is a child of Nicholas Mooney, deceased, capable of participating in Nicholas Mooney's estate under the law of descent and distribution; and not having been mentioned or provided for in the will of said Nicholas Mooney, the burden of. proof is upon plaintiff to show that he is such child of Nicholas Mooney. 5 Cyc. 628; Pickens's Estate, 163 Pa. St. 14. This he has attempted to do by an effort to establish recognition on the part of Nicholas Mooney of plaintiff as his child, and in doing this he has offered no evidence but what is entirely consistent with the theory that plaintiff is not the child of Nicholas Mooney. Plaintiff failed to make a prima facie case of recognition, for the loose acts pointing towards recognition shown by the evidence, and which occurred during the first years of plaintiff's life, are wholly insufficient to establish a case of recognition. Watson v. Richardson, 110 Iowa 673; Markey v. Markey, 108 Iowa 373. The evidence adduced on behalf of plaintiff to establish recognition is utterly destitute of reasonable precision. 17 Cyc. 818. Under the rule there is no conflict in the evidence adduced by the respective parties to this cause. "One enters the field of conjecture only in the absence of proof; when proof enters conjecture disappears." Conner v. Railroad, 181 Mo. 397; Higgins v. Railroad, 197 Mo. 300. The jury had no right to conjecture whether the circumstances shown in evidence were sufficient to constitute recognition by Nicholas Mooney of the plaintiff as his child or not, when proof that he was not entered the field. This is a well established principle of the law of evidence. 29 Cyc. 830; Roman v. Trading Co., 87 Mo. App. 186; Wear v. Lee, 26 Mo. App. 99. There was nothing done by

Nicholas Mooney inconsistent with the fact that plaintiff was not the son of Nicholas Mooney. Markey v. Markey, 108 Iowa, 373; Sandford's Estate, 4 Cal. 12; Lind v. Burke, 56 Neb. 785; Pina v. Peck, 31 Cal. 359. Evidence of reputation, as to who constitute the members of a family is admissible, where no superior evidence is available to show directly the legitimacy or illegitimacy. So, when plaintiff relies on recognition and reputation to establish his sonship, direct evidence which proves that he is not the son overcomes any presumption raised by recognition or reputation. Pickens's Estate, 163 Pa. St. 14; 16 Cyc. 1051. (2) The verdict of the jury is so manifestly, decidedly and palpably against the evidence as to show clearly that it was the result of passion, prejudice or other sentiment, rather than of the law and the facts, or that the jury misapprehended the facts, or principles of law governing the case. 29 Cyc. 822-824; Walton v. Railroad, 49 Mo. App. 620. The total disregard by the jury of the evidence on one branch of the case will warrant the granting of a new trial. Doty v. Steinberg, 25 Mo. App. 328. A new trial should be granted by the trial court where the verdict is manifestly against the weight and the entire current of the testimony. Taylor v. Fox, 16 Mo. App. 527; Borgraefe v. Knights, 22 Mo. App. 127. (3) Instruction 1 given by the court at the request of plaintiff, is erroneous in that it tells the jury, "that no presumption is to attach against the legitimacy of the plaintiff as a child of Nicholas Mooney, but on the contrary every presumption is to be made in favor of . . . the legitimacy of the said Chris Mooney," thus leading the jury to believe that even though plaintiff was born before the marriage of Nicholas Mooney with Mary Cooney, from the fact that Nicholas Mooney afterwards married plaintiff's mother they should presume that said Nicholas Mooney was the father of plaintiff. That is not the law. "There is no presumption that one who marries the

mother of a bastard is its father." James's Estate, 147 Pa. St. 527; 5 Cyc. 626. (4) The court committed error in giving instructions numbered 2, 3, 5 and 6 at the instance of plaintiff, for the reason that these instructions, in effect, declare the law to be that no matter who was actually and in fact the father of plaintiff, if Nicholas Mooney afterwards married plaintiff's mother and recognized plaintiff as his child, that is, held him out to the world as his child, plaintiff thereby became Nicholas Mooney's child. These instructions ignore the opening words of Sec. 341, R. S. 1909, to-wit: "If a man, having by a woman a child," etc. By these words the Legislature evidently intended that the first requisite to the operation of this statute should be that the child was begotten by the man referred to therein.

*D. D. Duggins* and *Robert M. Reynolds* for respondent.

(1) Parentage may at law be established, and can only in general be established, as regards the father, by a combination of facts, indicating the connection of parent and child, between an individual and the family to which he claims to belong. Principal among these facts are: that his mother was married to the person whom he claims as his father at the time he was born or begotten; that he has always borne his name and been treated and maintained and educated as his child; that he has been uniformly received as such in society and that he has been acknowledged as such by the family.    13 Am. & Eng. Ency. Law (1 Ed.), 224; Weatherford v. Weatherford, 20 Ala. 548; Loan Co. v. Bonner, 75 Ill. 315; Taylor on Evidence (Text Book Series) art. 649. (2) These facts were all shown by the evidence in this case. The plaintiff's mother was Mary Mooney, the wife of Nicholas Mooney. They were married on January 27, 1851, and the plaintiff was born on June 21, 1851, and was reared as a child

of the said Nicholas Mooney, and under and by the name of Mooney, and was fed, clothed, schooled and worked by the said Nicholas Mooney as his child and under his name, and recognized as the child of the said Mooney by society and the family. In addition to all this he bore a strong and marked personal resemblance to the said Nicholas. (3) The plaintiff is a competent witness to prove his own age and the date of his birth, and especially so when a question of pedigree is involved. State v. Cougot, 121 Mo. 463; State v. Marshall, 137 Mo. 469. (4) Resemblance in personal appearance to the claimed father is competent evidence by the child upon the question of paternity. 5 Cyc. 630; Wright v. Hicks, 15 Ga. 160; Shorten v. Judd, 56 Kan. 43; In re Jessup, 81 Cal. 458. (5) Even where the child is admittedly born prior to the marriage, our statute makes marriage and recognition by the father of the child as his, proof of the fact that he is the father of the child, and heirship is established in such manner. R. S. 1909, sec. 341; Bridenstein v. Bertram, 198 Mo. 347. (6) Not only is such evidence sufficient, but the appellant is precluded from raising such question here, inasmuch as it is a reversal of his position upon the trial in the court below. A party litigant cannot set up a theory in the appellate court different from the one presented by him for the decision of the trial court. Hill v. Drug Co., 140 Mo. 433; Hall v. Goodknight, 138 Mo. 576; Stewart v. Outhwaite, 141 Mo. 562; State v. O'Neill, 151 Mo. 67. (7) In the trial of the cause in the court below the appellant made no objection to the insufficiency of the evidence, asked no peremptory instruction either at the close of the plaintiff's case or at the close of the whole case—but framed his instructions upon the theory that such evidence if believed by the jury was sufficient to support a verdict for the plaintiff, and submitted the cause to the jury upon his part upon such theory. Defendants threw their evidence upon the

scales with plaintiffs and invited the verdict of the jury upon the preponderance of the evidence. Having done so they cannot now reverse positions. (8) The weight of the evidence is for the jury and the trial court, and the appellant cannot be heard upon that question here. Levels v. Railroad, 196 Mo. 606; Smoot v. Kansas City, 194 Mo. 513; Shoe Co. v. Sally, 114 Mo. App. 222; Bridenstein v. Bertram, 198 Mo. 350.

WOODSON, J.—This is a suit in ejectment and to determine the interests of the parties and to quiet title, etc., brought by the plaintiff against the defendants to recover the possession of a one-fourth interest in forty acres of land situate in Saline county, particularly described in the petition.

The common source of title was Nicholas Mooney, deceased, and the plaintiff contends that he is a pretermitted heir of said Mooney, claiming to be his son; and the defendants are the children of and devisees under the will of said Mooney and contend that the plaintiff was not a son of said Mooney. The plaintiff was not mentioned in the will, hence the claim that he is a pretermitted heir.

A trial was had before the court and a jury, which resulted in a verdict and judgment in favor of the plaintiff, from which the defendants duly appealed to this court.

The following facts are undisputed:

Nicholas Mooney, a young man and a native of Ireland, came to Missouri about the year 1848 or 1849, and located in St. Louis, and subsequently moved to Saline county. At the time of his departure from Ireland, and for several years prior thereto, he had known a young woman by the name of Mary Cooney, whom he left behind.

The plaintiff introduced evidence tending to prove that Mary Cooney left Ireland, came to Saline county,

Missouri, and on January 27, 1851, at Marshall, married said Nicholas Mooney. That plaintiff was born June 10th, same year—four months and seventeen days after the marriage was solemnized. That shortly thereafter they moved to a farm near Marshall, the premises in controversy being a part of it, where they continued to reside until their respective deaths, which was but a short time prior to the institution of this suit.

A number of other children were born unto that marriage, some of whom are the defendants in this case, and others are dead. The plaintiff was reared by Nicholas and Mary Mooney, upon the farm mentioned, along with the younger children.

To all appearances he was treated in the same manner by Nicholas Mooney as he treated the other children, and was called and known as Christopher Mooney, by those who were friends and neighbors of the Mooney family, and was regarded by them as a son of Nicholas Mooney. He was reared with the other children as his brothers and sisters, and all of them regarded and treated each other as such. He was also accorded the same treatment by Nicholas Mooney that he granted to the other children, and was schooled, clothed and supported in the same manner they were. He ate at the same table and had a room and slept with the other boys, and worked upon the farm just as they did, until he was about twenty-three years of age. He then began working for himself, and shortly thereafter married and continued to live in the same neighborhood, and they frequently visited each other just as families generally do. He also attended church with them and attended dances with the other children and neighbor boys and girls, and was known by them as one of the Nicholas Mooney children. That he called said Mooney "pa," and his son John always called him "grandpa." That he was never known by any other name than Mooney. That

he had never heard of any contention that he was not the son of Nicholas Mooney until after his death, and when he began this suit.

The witness Swisher testified that upon one occasion, when he spoke to Nicholas Mooney of the plaintiff, he said, "Ah! Chris is a good boy, he is my boy."

Several witnesses testified that the plaintiff bore a marked and strong resemblance to Nicholas Mooney, especially his nose, eyes and face generally.

Jeff Dawson, colored, testified that Mary Mooney told him that she and Nicholas Mooney were born in Ireland and were engaged to be married in that country; that Nicholas preceded her to this country less than one year. That shortly after reaching here, he sent for her to come over, and that she came in response to that request, and that shortly after she reached Marshall they were married, and after the marriage the plaintiff was born.

The defendant's evidence tended to show that about two years after Nicholas Mooney left Ireland, and while he was in Saline county, Mary Cooney came over from Ireland and first stopped in St. Louis, at the home of Mrs. Anna K. Adams, who was also from Ireland and had known Mary there. That when Mary Cooney arrived at the home of Mrs. Adams, she was in an advanced stage of pregnancy. That after remaining in St. Louis for a short time Mary went to Saline county, and shortly thereafter, within a month, she gave birth to a male child, the plaintiff in this case. That the child was born at the house of Mrs. Duffy, near Marshall. That shortly after the child was born, Mary was married to Mooney, with the child in her arms. That the marriage was performed by Father Donnelly, a Catholic priest, and that just before the marriage ceremony was performed Father Donnelly christened the child, and Mary Cooney, its mother, gave the name of the father of the child as Pat Daley, and named the child Chris Daley.

The witnesses Mrs. Bridget Holmes and Pat Duffy, testified that they were present at the marriage and witnessed the christening of the child as Chris Daley, Pat Duffy acting as sponsor for the child so christened. That Nicholas Mooney never returned to Ireland after he came to this country.

Mrs. Anna Adams testified as follows:

"Q. What is your name, age, place of residence, and where were you born? A. My name is Anna K. Adams, my age is eighty-two years, I was born in Ireland and came to this country when a small girl.

"Q. Where did you live after coming to this country? A. We first came to Saline county, Missouri; we then went to St. Louis, Missouri, and lived there a long time.

"Q. What was your mother's name? A. Margaret Duffy.

"Q. Did you know Nicholas Mooney, late of Saline county, Missouri, in his lifetime? A. Yes, I have known him ever since he first came to America. He came to our house in St. Louis when he first came from Ireland, he came direct to our house. He was a young man then.

"Q. Did you know Mary Cooney, the woman Nicholas Mooney married? A. Yes, I knew her in Ireland where she was a girl, and after she came to America.

"Q. Which one came to America first, Nicholas Mooney or Mary Cooney? A. Nicholas Mooney came first, about two years before Mary Cooney came.

"Q. Did you first see Mary Cooney when she first came to this country from Ireland, if so, when and where? A. Yes, she came direct to my house in St. Louis from Ireland and stayed a short while and went up to Saline county with my mother and lived with her until she married Nicholas Mooney.

"Q. What was Mary Cooney's condition when she first came to your house in St. Louis direct from

Ireland?    A.    She was in delicate condition and shortly after going to Saline county she gave birth to a male child and that child is Chris Daley, called Chris Mooney.

"Q. Did Mary Cooney afterwards marry Nicholas Mooney?    A.    Yes, they afterwards married in Saline county.

"Q. Was the boy Chris born before or after the marriage?    A.    He was born before the marriage at my mother's house.

"Q. By what name was he called?    A.    He was called Chris Daley and went by that name for some time after the marriage of his mother.

"Q. Did you know who was the father of the boy Chris Daley?    A.    Mary Cooney, his mother, said at the time the boy was born that his father was named Pat Daley and that he lived in Ireland.

"Q. Did you know Pat Daley in Ireland before you came to this country?    A. Yes.

'Q. Was it well known at the time of the marriage of Nicholas Mooney and Mary Mooney that the boy Chris was not Nicholas Mooney's child?    A.    Yes; there was no contention that he was the child of Nicholas Mooney and he was known as the child of Pat Daley.    His mother so stated and we believed her.

"Q.    Do you know whether or not Nicholas Mooney went back to Ireland between the time he first came to this country and the time Mary Cooney arrived in this country from Ireland?    A. He did not return to Ireland after coming to this country.    He remained in St. Louis and Saline county, Missouri, from the time of his first arrival until after the birth of the boy Chris and his marriage to Mary Cooney.

"Q.    Mrs. Adams, I will ask you if the boy born to Mary Cooney before her marriage to Nicholas Mooney is the same person as Chris Mooney now claiming to be the child of Nicholas Mooney?    A.    Yes, he was raised by Nicholas Mooney."

Mrs. Bridget Holmes, of lawful age, being first duly sworn on her oath, testifies as follows on behalf of the defendant:

"Q. What is your name? A. Bridget Holmes.

"Q. Where do you live? A. I live two miles north of Shackelford in Saline county.

"Q. How long have you lived there? A. Fifty-two years.

"Q. I will ask you if you knew Nick Mooney in his lifetime? A. Yes, sir, I did.

"Q. Did you know the woman whom he married, Mary Cooney? A. Yes, sir.

"Q. Were you present at the marriage? A. I was.

"Q. Where did that marriage take place A. In Marshall, in my aunt's house.

"Q. Who was your aunt? A. She went by the name of Mrs. Duffy. She was Mrs. King. I heard her called Duffy here.

"Q. By whom was Nick Mooney and Mary Cooney married? A. By Father Barnard Donnelly, the minister who used to come here then.

"Q. I will ask you if at the time of her marriage she had a child? A. Yes, sir; she had a baby, I could not say how old, it might be a month or two weeks.

"Q. Is that baby she had at the time she was married to Nick Mooney the plaintiff in this case who calls himself Chris Mooney? A. Yes, sir.

"Q. That the same baby? A. Yes, sir.

"Q. I will ask you if there was any other ceremony there at that time by the priest, other than the marriage ceremony with reference to the child? A. The child was baptized.

"Q. You may state by what name was that child, now known as Chris Mooney, christened by the priest? A. His father's name was called Patrick Daley.

"Q. What was the baby called? A. Chris Daley.

"Q. Who gave to the priest the name of the child? A. Mary Cooney.

"Q. You heard that? A. Yes, sir.

"Q. You state to the jury that that plaintiff is the identical baby? A. Yes, sir; I think he is the same one.

"Q. Who else was present at that time? A. My brother and the priest and another man, Mr. King, a cousin.

"Q. Who is your brother? A. Patrick Duffy.

"Q. Did he have any part in that ceremony? A. He was one of the sponsors for the child.

"Q. Were you well acquainted with Nick Mooney, and his wife Mary, from that time up until the time of his death? A. Yes, sir; I never met them very often, I knew them all the time.

"Q. Were you related in any way to either one of them? A. No, sir; not at all."

Mrs. Margaret Trigg testified:

"Q. Where do you live? A. About two miles from Shackelford.

"Q. How long have you lived there? A. I have lived there for over forty years.

"Q. How long have you lived in Saline county? A. Since 'forty-seven.

"Q. I will ask you if you knew Mary Cooney, who became the wife of Nick Mooney, deceased? A. Yes, sir; I have seen her when she come out; I never knew her until that.

"Q. Did you see her when she first come here? A. Yes, sir; I saw her the next morning.

"Q. What was her condition then? A. She was in a very delicate condition.

"Q. Was she pregnant with child at that time? A. Yes, sir.

"Q. How long after she had been here until she gave birth to the child? A. I could not say exactly

how many days or weeks, but a very short while or a few days.

"Q. She was afterwards married to Nicholas Mooney? A. Yes, sir.

"Q. Were you at the marriage? A. No, sir; my brother and sister were there.

"Q. Was the baby born before or after the marriage? A. Before.

"Q. Was that baby Chris Mooney, the man that calls himself Chris Mooney in this suit? A. Yes, ,sir."

Mr. Pat Duffy testified:

"Q. What is your name? A. Pat Duffy.

"Q. Where do you live? A. I live about fifteen miles south of here, between here and Sweet Springs.

"Q. How long have you lived in Saline county? A. Since 'forty-seven.

"Q. I will ask you if you were acquainted with Mary Mooney or Mary Cooney who married Nick Mooney? A. I was.

"Q. Do you remember when she first came to this country from Ireland? A. I do.

"Q. How soon after she arrived at Marshall did you see her? A. Well, I could not tell you, just in a few days, not more than a week.

"Q. What was her condition then? A. Well, I could not tell, I supose she was from her looks, she was in the family.

"Q. Did she shortly afterwards give birth to a child? A. Yes, sir; she did.

"Q. Was that child the man, Chris Mooney, the plaintiff in this case? A. Well, I don't know, I think so.

"Q. Now, were you present at this marriage? A. I was.

"Q. Was the child there at that time? A. It was.

"Q. Was there any ceremony by the priest with reference to this child? A. Yes, sir; I was the sponsor of the child.

"Q. What did the priest do? A. The priest asked the mother what the father of this child was. She just said his name was Pattie Daley. Those were the very words.

"Q. By what name was the child christened? A. By that name.

"Q. Chris Daly? A. Yes, sir; I was his sponsor, I was as close to him as to that table.

"Q. Was he known after that as Chris Daley? A. I don't know, I moved to Sweet Springs and I lost all trace of him. I was here and saw him once in a while, but to say I was familiar with them and acquainted, I was not. That was the last I knew much of them and I bought a farm and moved up there.

"Q. How long after Mary Cooney came to Saline county was she and Nick Mooney married? A. Over a year, I could not tell exactly, it has been a long time ago; it was a year or more, because I was acquainted, I seen Nick Mooney in Marshall several times.

"Q. Nick Mooney had been here a year or more before Mary came? A. Yes, sir; I know that, I am satisfied of that, but the exact date I could not tell.

"Q. This child, how old was this child when it was christened? A. Not more than a week or so old.

"Q. A small child? A. Yes, sir; a small baby. The lady with me just held it in her hands.

"Q. You say you saw Mary Cooney soon after she came? A. Yes, sir.

"Q. And she was in this delicate condition? A. Yes, sir; to the best of my opinion, I could not tell.

"Q. She shortly afterwards gave birth to the child? A. Yes, sir.

"Q. And in a short time after that she married Nick Mooney? A. Yes, sir; I was there when they married.

"Q. How long had you known Nick Mooney before he married Mary Cooney? A. I know that it was at least a year and over, more than a year.

"Q. How long had you known Mary Cooney before she married Nick Mooney? A. I knew her in Ireland.

"Q. After she came here, just a short time? A. Yes, sir.

"Q. About how long from the time she came and the birth of the baby until the marriage? A. A month or so, about a month.

"Q. You said a while ago that she was here a year or so?

"A. F. Rector, Esq., counsel for the defendant: I submit to the court the witness did not understand the testimony.

"Q. You said a little while ago she was here nearly a year before the marriage? A. That I knew her a year; I cannot hear good.

"Q. You said a while ago that Mary Cooney was here nearly a year before she married Nick Mooney? A. No, sir.

"Q. Did you not say that awhile ago? A. I never said that.

"Q. You say that Mr. Mooney had been here a year and over? A. Yes, sir."

Wm. Zahns testified as follows:

"Q. Where do you live? A. Live here in Marshall, I come to Saline county in the year 'fifty-eight.

"Q. Did you know Nick Mooney and his family at that time? A. I did, I got acquainted with them pretty soon afterward I came here.

"Q. Did you get acquainted with the boy Chris, that is now called Chris Mooney? A. Well, yes, sir; I got acquainted with him in the year 'sixty; I was liv-

ing then within about a mile of where they live. I was making brick on Salt Fork, and they lived where the Marshall burying ground is now.

"Q. Do you know by what name that boy went at that time, and what he was called? A. Well, I never heard any other name than that, I remember nothing except Chris.

"Q. Did you know him as Nick Mooney's child, or the child of some one else? A. Well, from hearsay, I did not know him as Nick Mooney's child.

"Q. That was about 'sixty? A. Yes, sir; and before when I lived close to them.

"Q. It was known that he was not Nick Mooney's child? A. Well, from hearsay, you see my wife and her relations and also Mooney's wife, Mooney and his relations, they were neighbors and friends in the old country. What I understood from my first wife, and of course I was told by them.

"Q. R. M. Reynolds, Esq., counsel for the plaintiff: Told by whom, by your wife?

"Q. I will ask you this question Mr. Zahns: Was it generally known in the neighborhood that he was not Nick Mooney's child at that time? A. Yes, sir. It was generally known among the Irish and Catholic people."

Owen Swinney testified that he had lived in Marshall fifty years, and knew the Mooneys. That he did not know much of the boy Chris until after the war. That he never heard much about him, but he had heard it said by some of the old people that he was not Mr. Mooney's son.

Mrs. Emily Swinney testified that she had lived in Marshall all of her life, was born there. That she knew Nicholas Mooney and Mary, his wife; also Chris Mooney. That she knew nothing of his parentage except from hearsay. That she had heard that he was not the son of Nicholas Mooney, but not very frequently, as she was but a girl, and they did not talk

to her much about the matter. That she understood from the talk of the neighborhood that Chris was born before the marriage of Nicholas Mooney and Mary Cooney, but had no personal knowledge of the matter.

H. C. Hall testified that he knew Nicholas Mooney, but not Chris the boy. That he built and painted a house for Mr. Mooney, and one day while at dinner a man and a woman drove up with a child, hitched the horse and came in. Mooney never introduced them to him, and he never spoke to them. That after dinner he began to paint the house and Mr. Mooney came around, and he, Hall, said: "Uncle Nick, who was that ate dinner with you to-day?" That in reply he said, "Chris Daley," cross-like.

John Riley testified that he had lived in Saline county about forty years and had known Chris Mooney from about 1871 or 1872. That back there he went by the name of Chris Daley. That his father and other old men called him Chris Daley, or rather that he went by that name.

The will of Nicholas Mooney was introduced in evidence, by which he gave all of his estate to his son George Mooney and to his daughter Julia Malony, except one dollar was given to his daughter Bridget Allinburg.

I. There is but a single issue of fact involved in this case and that is, was Christopher Mooney, the respondent, the son of Nicholas Mooney, deceased? If so, then he is a pretermitted heir of Nicholas Mooney, and is entitled to participate under the laws of descent and distribution, in the estate of his deceased father.

Under this issue, section 341, Revised Statutes 1909 (which was first enacted prior to 1845) which provides that "if a man, having by a woman, a child or children, shall afterward intermarry with her, and shall recognize such child or children to be his, they

shall thereby be legitimated," has but little if anything to do with this case for the reason that it is contended that the plaintiff was not in fact the "child of Nicholas Mooney," and therefore the simple recognition and treatment of him as a child does not bring him within the provisions of that statute.

In a case of this character, it seems but right and just that the burden of proof rests upon the plaintiff to establish the relationship of father and son. [5 Cyc. 628; Pickens's Estate, 163 Pa. St. 14.]

Recognizing that to be the law, counsel for respondent undertook that burden, and introduced a number of witnesses whose testimony tended to prove that during the entire life of Nicholas Mooney, after they respectively formed their acquaintance, he treated the plaintiff as his son, in that, the plaintiff bore his father's name, and was maintained and educated by him as he did his other children; also that he was uniformly recognized and received as such in society, and that he was acknowledged as such by the members of the family.

Jeff Dawson testified that Mary Mooney told him that she and Nicholas Mooney were sweethearts in the old country, and that they were engaged to be married before he left there; that within a few months after he reached this country he sent her thirty dollars and told her to come over; that she came, and at first stopped in St. Louis, where she was detained for a while on account of the ice in the river; that Mr. Mooney visited her in St. Louis, and that shortly thereafter she went to Marshall and was there married to Mr. Mooney. That the child was hers, and that it was born before the marriage.

Counsel for appellant earnestly insist that the evidence for the respondent failed to make out a prima facie case, and that an instruction in the nature of a demurrer to the evidence should have been given, and in support thereof we are cited to Watson

v. Richardson, 110 Iowa, 673; Markey v. Markey, 108 Iowa, 373; 17 Cyc. 817 and 818 D. 1 and 2 a.

The rule announced in those authorities is to the effect, that in the absence of direct and positive testimony tending to prove paternity, casual remarks and loose acts of the parties, pointing toward recognition of such relation, are wholly insufficient to make out a case by recognition.

The soundness and wisdom of that rule cannot be questioned, but what are casual remarks, and loose acts of the parties, when applied to a particular case, is not always easy to determine. The record in this case is absolutely barren of all direct evidence tending to prove that Nicholas Mooney, by word of mouth or otherwise, ever acknowledged that the respondent was his son, yet it contains many facts and circumstances from which, if standing alone or unexplained by other evidence in the case, a jury might infer such relationship existed between them; for instance, the birth of the child, the subsequent marriage of Mooney to the child's mother, and his care for, support of, and education of the child, coupled with the fact, that with his knowledge, if not with his consent, the respondent bore his name, was recognized and received into society as his son, and by his children as a brother.

All of those matters are facts and circumstances indicating the relationship of parent and child; and the law seems to be well settled that paternity may be established and in many cases can only be established as regards the father, by a combination of words and facts indicating the relation of parent and child. And the authorities seem to be uniform in holding that the principal facts so indicating that relationship are the marriage of the mother to the person who it is claimed was the father of the child, at the time he was begotten or born; that the child has always borne the name of such person, and had been treated, maintained and educated as his child; and that the child

had uniformly been recognized and received in society as the son or daughter of such person, and so acknowledged by the other members of the family. [13 Am. & Eng. Ency. Law (1 Ed.), p. 224; Weatherford v. Weatherford, 20 Ala. 548; Illinois Loan Co. v. Bonner, 75 Ill. 315; Taylor on Evidence (Text Books Series), art. 649.]

The weakness of respondent's case consists of the fact that there is no evidence in this case tending to prove that it was claimed by anyone that Nicholas Mooney was the father of the respondent at the time he was begotten or born, and that there is no direct evidence tending to show that he ever recognized or acknowledged respondent as being his son, and he did not always bear his name.

We are clearly of the opinion that when the entire evidence was in, there was no case to submit to the jury. The reason for that rule is this: the respondent's evidence was wholly circumstantial, and tended to prove two states of fact: first, facts which, if considered alone, may have indicated the relationship of parent and child between Nicholas Mooney and the respondent; but when considered in connection with the evidence of appellants, which was positive and direct to the point, that such was not their relationship, which consisted of the testimony of unimpeached witnesses, who were old residents of Saline county, and apparently were intelligent and fairminded and honest in testifying who knew Nicholas Mooney and Mary Cooney ever since their respective arrivals in this country, most of whom were eye witnesses to the matters about which they testified, and consequently they spoke from personal knowledge as to when both of them came from Ireland to this country; the pregnancy of Mary before and at the time she arrived in St. Louis, the date of and the birth of the child, the christening of the child, and the subsequent marriage of Nicholas Mooney and Mary

Cooney, and the date thereof, then the case assumes quite a different aspect, for the reason that the respondent's circumstantial evidence was not in conflict with the direct and positive evidence introduced by appellants, and it points as clearly and strongly to prove the defense interposed to the case, as it does to establish the relationship of father and son between Nicholas Mooney and Christopher Mooney; that is, the respondent's evidence tends as strongly to prove that Nicholas Mooney's conduct towards and treatment of the innocent and helpless child, was as much due to kindness on his part to it, and his love for his wife, its mother, and a desire to cast a mantle of charity over her shame, and thereby, at the same time shield "the skeleton in the closet," and hide her dishonor, which he had condoned, and to which he became *particeps criminis* by marrying her, from public view, as it did to establish his paternity by such relationship.

In discussing this question, 17 Cyc. p. 817 D. says: "A conclusion is not supported by circumstantial evidence unless the facts relied on are of such a nature and so related to each other that no other conclusion can fairly or reasonably be drawn from them, and this requirement is strictly enforced where decisive direct evidence is probably obtainable, but is not produced. *A fortiori* the circumstances must agree with and support the hypothesis which they are adduced to prove. A fact cannot be established by circumstances which are perfectly consistent with direct, uncontradicted, and unimpeached testimony that the fact does not exist."

Under the rule just quoted, when applied to this particular class of cases, and especially to the case at bar, there is no real conflict between the evidence introduced by the respective parties to this action. Certainly not sufficient difference to support the verdict and judgment in this case.

In discussing this general rule in the case of Conner v. Missouri Pacific Railway Company, 181 Mo. 397, l. c. 411, this court well said: "If there is substantial evidence tending to show that an accident occurred in any one of two or more ways, or any other number of ways, while the burden rests upon the plaintiff to establish such cause of the accident as would render the defendant liable, it by no means presents a case of mere conjecture; but is a question of fact, which should be submitted and determined by the triers of the facts. We only enter the field of conjecture in the absence of proof; when proof enters, conjecture disappears."

The doctrine just announced was approved by this court in the case of Higgins v. St. Louis & Suburban Railway Company, 197 Mo. 300.

As previously stated, this rule is peculiarly applicable to cases of this character, and this one in particular, for the reason that so much of the evidence introduced tends as strongly to prove a state of facts consistent with the fact that Nicholas Mooney was not the father of Christopher Mooney, as it does to establish the fact that he was his father.

Under that rule, the burden of proof resting upon the respondent to make out his case by a preponderance of the evidence, he has clearly failed to do so, for there was nothing done or said by Nicholas Mooney inconsistent with the fact that the respondent was not his son. This rule is recognized and upheld in the following cases: Markey v. Markey, 108 Iowa, 373; Sandford's Estate, 4 Cal. 12; Lind v. Burke, 56 Neb. 785; Pind v. Peek, 31 Cal. 359.

There are several other questions presented and discussed in briefs by counsel for appellants, but the conclusions before reached render it unnecessary for us to pass upon them.

We are, therefore, of the opinion, that upon the whole record the respondent was not entitled to a re

covery, that the judgment should be reversed and the cause remanded to the circuit court with directions to ascertain the interest of the parties, as herein indicated, and to quiet the title as prayed for by defendants in their answer.

All concur.