# TISTHAMMER v. UNION PACIFIC RAILROAD CO.
(No. 1580; April 7, 1930; 286 Pac. 377)

For the appellant there was a brief by *John W. Lacey* and *Herbert V. Lacey,* of Cheyenne, and *Erle H. Reid* and *Walter T. More,* of Torrington, and oral argument by *Herbert V. Lacey* and *Mr. More.*

For the respondent there was a brief by *J. L. Sawyer*, of Torrington.

RINER, Justice.

This case is before the court by direct appeal from a judgment of the District Court of Goshen County in favor of J. B. Tisthammer, respondent here, plaintiff below, who brought the action to recover damages on account of alleged injury and destruction of live stock, against the Union Pacific Railroad Company, which now seeks a review of the record made in the case.

Plaintiff's petition alleges the corporate character of the defendant company; its duty to erect and maintain a sufficient and suitable fence on each side of its railroad track about two and one-half miles east of the town of Yoder, near the Bullard beet dump and a public road crossing there, and also to have said fence connected with the public road crossings with suitable and sufficient cattle guards so as to prevent live stock from passing over the cattle guards and through the fence and straying upon defendant's tracks; that this duty was not fulfilled at that point; that about October 14, 1926, seven head of live stock of a specified value and owned by plaintiff, by reason of defendant's negligence in not performing the duty incumbent upon it as aforesaid, got upon defendant's tracks and were injured and killed, to plaintiff's damage in a claimed sum. The defendant's answer admitted that one of its trains did, on the date alleged, strike and injure five head of cattle, but denied generally all other allegations of the petition.

A jury being demanded, the case proceeded to trial, and upon the conclusion of plaintiff's evidence the defendant moved for a directed verdict. This motion being denied, evidence in defense of the action was introduced. Upon the conclusion of the trial, defendant again asked for a directed verdict, and this request also the court declined to grant, due exception being allowed to the ruling. The jury rendered a verdict for somewhat less than one-half the amount claimed, and the court entered judgment accordingly.

A number of errors are urged, based upon alleged incorrect rulings made by the court in the course of the trial. Underlying these matters and a controlling question in the case, was whether the cattle injured were struck by defendant's train inside the latter's right of way or on a public road crossing. Sections 3086 and 3087, Compiled Statutes of Wyoming 1920, requiring railroad companies to construct and keep in repair on each side of their tracks, a sufficient fence so connected with suitable cattle guards at

all public road crossings as to prevent stock from getting on the railroad tracks, and imposing liability to the owners of stock injured by reason of the failure to do this, contain in Section 3087 the following proviso: "Provided, that no corporation operating a railroad shall be liable for any damage occasioned by the wilful act of the owner or of his agent or employees or for stock killed or injured on public road crossings unless negligence on the part of such corporation, its agents, servants or employees can be shown." As the pleadings in the case raise no question of negligence in the operation of the train, both parties concede that under the statute, to make a case for the plaintiff, it was necessary to establish that the cattle injured were struck on defendant's right of way, and not on the public highway crossing. This view would seem to be correct in the light of the proviso just quoted.

The facts proper to be considered, as we understand them, in disposing of this question, are in brief substantially these: Running in an easterly and westerly direction through the northeast corner of Section 36, Township 23 North, Range 62 West and the northwest corner of Section 31, Township 23 North, Range 61 West, the defendant's railroad and right of way crosses a public highway, which runs north and south along the line separating the two townships aforesaid, that line being a few feet easterly from the center line of the highway. Eastward, approximately 500 feet from the crossing and on the south side of the right of way, was a beet dump known as the Bullard beet dump. It was in charge of a man who lived in a bunk house just outside of the right of way and also on the south side thereof, the house being about 100 feet from the highway crossing west of it. Between the right of way and the east side of the highway there was a four wire fence, with board wings leading on each side of the track itself to a steel saw-tooth cattle guard, which lay across the track and extended north and south to these wings. From the center of the crossing to the center of the east cattle

guard was 28 feet. Sixty-seven feet easterly from the center of the crossing on the south side of the track was a switch stand to control the entrance upon a side track for the beet dump. The westerly frog, where that side track leaves the main line, was 145 feet from the center of the crossing, or 117 feet from the center of the east cattle guard. The highway at the crossing between the two cattle guards was about 65 feet in width. These measurements were from actual survey and a map of the place, testified to without dispute as correct by the man who made them—one of defendant's witnesses. North of the right of way and east of the highway was a beet field, separated from the highway by a three wire fence. At the southwestern end, where this fence joins the right of way fence, was a 16 foot gate.

On the evening of October 14, 1926, defendant's freight train of fifteen cars was proceeding eastbound and approached the crossing above described about 8:45 o'clock. The engine was equipped with a standard electric headlight, whereby the engineer was able to see moving objects on the track or right of way one-half mile ahead. When the engine was 500 or 600 feet from the crossing, the engineer, as he testified, observed some cattle running north over the crossing. These safely cleared the train. At a distance of about 200 feet he noticed more cattle approaching the crossing from the south, running north and these the engine struck as they reached the rails before the train could be stopped. The engineer saw no cattle in the right of way east of the cattle guard and none ran ahead of the engine over the east cattle guard. Also, as he said, the light of the headlight would have shown them very plainly had that been so. Testimony to the same effect was given by three other witnesses of the accident—the head brakeman who was riding on the left seat box on the engine, the freight train conductor who was riding behind the engineer, and the rear brakeman who was standing in the right gangway of the engine, preparatory to getting off

for switching work at the siding referred to above. All these men were looking eastward as they approached the Bullard station. There appear to have been no other eyewitnesses of what occurred at that time.

After the train had stopped, it was again moved forward a few car lengths. The situation then disclosed, as related by the man in charge of the Bullard beet dump, who was unconnected with either party to this litigation but a witness for defendant, was as follows: He was in the scale house as the train arrived and hearing a calf bellow, he immediately went over to the crossing, about 100 feet distant. There he found some of the train crew and the assistant train master Murdock, who had been riding in the caboose of the train. He saw two cattle in the highway on the south side of the track, about 6 or 8 feet from it, piled on top of each other. The top one was pulled off and the one underneath got up and moved away. Going easterly he found a calf on the right of way about 30 feet distant and on the south side of the track about 6 or 8 feet from the rail. Still farther eastward, about 35 or 40 feet and also on the south side of the track about 4 or 5 feet from the south rail, another animal was found. Approximately 115 feet from the east cattle guard parts of two other animals were found on the track, one of them wedged in the frog already mentioned. A pick had to be used to get the parts free from the frog, and these were thrown over to the north side of the track. An examination showed the steel teeth of the east cattle guard to be bent over and a considerable amount of hair and blood was found on the guard. Blood, hair and flesh were found on the track and between the rails from the cattle guard to the frog. This man's testimony was substantially corroborated by the train crew, one of whom stated he first saw the cattle as they ran into the light from the headlight from the south; that the leaders seemed to get scared, tried to get back and milled on the crossing, and then the train struck them. The testimony concerning finding hair, blood, etc., on the

cattle guards and on the track extending to the frog stands in the record uncontradicted. The carcasses of the cattle were pulled away from the railroad tracks by the section men and buried the following morning. No other witnesses testified to conditions immediately following the accident.

The evidence to establish that the cattle were struck on the right of way was purely circumstantial, except for the opinion testimony of a former railroad engineer presently to be mentioned. Plaintiff's witness Foster testified that on the evening of the 13th of October, 1926, "the night before the animals were killed," he drove in his car to the Bullard beet dump and about 7:30 or 8 o'clock found cattle in the highway west of the dump; he honked his horn and they went east through the fence on the north side of the track. On rebuttal he stated—for the first time and over objection—that he saw about 20 animals on the right of way on that occasion. However, the man in charge of the beet dump testified that he had been out of the house and along over the right of way to the east end of the beet dump twenty minutes before the accident and knew of no cattle on the right of way that evening. One of plaintiff's witnesses told of seeing a path leading through the right of way fence the morning after the accident.

The assistant train master Murdock testified on cross-examination that after the accident, the south wing fence of the cattle guard was found knocked down. He had previously testified that he made an examination of the highway near the crossing, using a bright light, and found a considerable number of cattle tracks there and that he examined the ground inside of the right of way fence for a distance of 80 feet east of the cattle guard, but found no cattle tracks there. The section boss was at the scene of the accident the next morning and also made an examination. He stated that he found no tracks or other indications of animals having been at large on the right of way; on the highway he found cattle tracks and also where the cattle had been lying down there by the railroad track.

The testimony of these witnesses, relative to the tracks of animals, seems to be undisputed. Other than what these men said, there was no proof of any tracks of cattle leading to where the carcasses were found on the right of way.

A former railroad engineer, another of plaintiff's witnesses, was allowed, over objection, to state that he ''would consider it pretty near impossible to carry cattle from the highway to where they said the two was buried (referring to those found in the frog) ; the rest of them, it could have been done;'' that these two were hit possibly 30 or 40 feet west of where they lay. Yet on cross-examination the same witness said, it was possible for the engine to carry an animal for possibly 100 or 200 feet before it was thrown off of the cow-catcher or some part of the engine; that it was also possible for cattle to be struck by a train and pushed along in front of it for 100 or 200 feet; as he said,—''I have seen it done.'' He also said that the animal carried along under the train for 200 feet would be ''pretty badly mangled;'' but this would not be so where it was carried along on the engine—it would simply slide off; as he stated, —''I have had them do it.'' Still another of plaintiff's witnesses who saw the carcasses the morning after the accident, testified that some of the cattle were ''pretty badly mashed'' and some were not, and that the cattle were ''drug a ways'' to the best of his knowledge. No animals except those struck by the train were after the accident found in the right of way, so far as the record shows. The testimony regarding the condition of the fence between the highway and the right of way is apparently in conflict.

A careful survey of all the evidence in the case has led us to the conclusion that there is no real conflict between the evidence introduced by the respective parties to this action concerning the place where the cattle were struck. We have been materially aided in reaching this result by certain principles applicable to evidence of the character outlined above and their exemplification in cases where the

facts have somewhat resembled those at bar. A few only of these it will suffice now to review.

It must be conceded that a logically connected train of circumstances may be as cogent of the existence of a fact as any direct evidence and indeed may at times outweigh opposing direct testimony. But, as said in Mooney v. Mooney, 244 Mo. 372, 148 S. W. 896, 901, where the court quoted from a well known text (17 Cyc. 817):

"A conclusion is not supported by circumstantial evidence unless the facts relied on are of such a nature and so related to each other that no other conclusion can fairly or reasonably be drawn from them, and this requirement is strictly enforced where decisive direct evidence is probably obtainable, but is not produced. A *fortiori* the circumstances must agree with and support the hypothesis which they are adduced to prove. A fact cannot be established by circumstances which are perfectly consistent with direct, uncontradicted, and unimpeached testimony that the fact does not exist."

In Henderson v. St. Louis & Hannibal Ry. Co., 36 Mo. App. 109, an action brought to recover for live stock killed by defendant's train, the plaintiff's contention was that the cattle were injured because of the company's failure to fence its road up to the public crossing and to connect it there with cattle guards. In the course of its opinion, the court recites the facts of the case and its conclusion thereon quite fully, as follows:

"The only eye-witnesses of the accident were the defendant's engineer and fireman, whose evidence is referred to hereafter. The plaintiff and his witnesses testified as to the collision simply from evidence of hair and blood on the track.

"It was conceded, by all the testimony, that the animals were killed by a passenger train going from east to west. The plaintiff, himself testifies: 'The steer was killed and put off about two hundred yards maybe,' and again, 'It is about one hundred yards from where the animals were killed to the west cattle-guard.' His witness Pritchet

testifies: 'The cow was carried up away inside, I suppose one hundred yards inside of a field, that is, inside of the railroad track, where it was fenced; the steer was found outside.' It will be thus seen that, upon the plaintiff's own testimony, the animals were struck within the limits of the public road, and his testimony leaves it entirely to conjecture whether they entered there or not.

"The defendant's engineer and fireman both positively testified that the cattle were struck by the westbound passenger train, not only within the limits of the public road, but upon the plank crossing of said road, and that one of them was dragged by the engine clear into the adjoining field, derailing the engine. They were the only eye-witnesses of the accident, and further testified that the cattle were first noticed when the engine was within a short distance of the road crossing, and that all precautions were observed to avoid a collision, that could be, under the circumstances. Their testimony is corroborated by one Powrie, who examined the place the second morning after the killing, and found hair on the track four feet from the plank crossing and fourteen feet within the limits of the public road. Their testimony is nowise impeached or contradicted, either by the evidence of the plaintiff, or by circumstances; on the contrary, it is corroborated as far as the plaintiff's evidence, which is mainly conjectural, and surrounding circumstances can furnish any corroboration.

"Upon this showing of the facts by the plaintiff, the defendant's demurrer to the evidence should have been sustained, and upon all the evidence, the defendant was entitled to a verdict. The defendant had no right to close the public highway by a fence, and it was immaterial whether the highway was one *de jure* or *de facto*. Luckie v. Railroad, 76 Mo. 639. If the cattle entered upon the track where the defendant was under no obligation to fence, and received their injuries owing to such entry alone, the plaintiff could not recover under Section 809 of the statute. Cecil v. Railroad, 47 Mo. 246; Ehret v. Railroad, 20 Mo. App. 258, and cases cited."

The case of King v. Chicago, R. I. & P. Ry. Co., 88 Iowa 704, 54 N. W. 204, 206, is also instructive. From the opinion we quote:

"As to the colt in controversy, the undisputed facts are that plaintiff owned the colt; that it was killed by defendant's engine on March 29, 1890;   *   *   *   After going north from plaintiff's house over the railroad, the highway runs east along the north side of the railroad. In this fence, and about three fourths of a mile northeast of plaintiff's home there is a gate, which, it appears, had for some time been in such a condition as to allow stock to pass through it onto the railroad right of way. One fourth of a mile east of this gate the colt was found dead on the right of way. The morning when the colt was found dead the mother was in the yard at plaintiff's house. The colt was 10 months old. For a distance of about 50 feet west of where the colt was killed, and up to the place where it lay, there were marks between the rails that 'looked like something had been struggling there.' Blood was also found along the ties, and a portion of the colt's entrails at the place where it looked as though it (the colt) had been dragged to the east. The testimony of the engineer was to the effect that on the night of March 29, 1890, he was running an engine on defendant's road; that his engine struck a horse or colt on the highway crossing north of plaintiff's home, and carried it about 1½ miles east; that the train was running about 50 miles an hour, and the colt was thrown up on the pilot. It seems to us that there is not necessarily any conflict in the evidence touching the killing of this colt. Plaintiff claims the colt got on the right of way through the gate heretofore mentioned, but there is no evidence whatever to show such fact, unless the finding of the colt's entrails on the track, and the further fact that the colt was found dead east of the gate, should be so considered. It is incumbent upon plaintiff to show that the colt was struck on defendant's right of way. There is no evidence of tracks from the gate towards the point where plaintiff claims the colt was struck. There is nothing to indicate that this colt ever passed through said gate. No one testifies as to having seen the colt, while alive, nearer this gate than at plaintiff's home,—a distance of over a mile and a half from where it was found. The colt was only 10 months old, was running with its mother, and the mother was home on the morning the colt was found. That the colt was thrown on the pilot at the crossing, and carried to the point where it was found, is not improbable when we consider that the distance would be covered in about a minute and a half at the rate the train was running. In any event, plaintiff has not shown

such facts as warranted the jury in finding for him as to the colt. It is not shown by footprints or by hair on the gate, or in any other way, that the animal came through that gate onto defendant's right of way, and was there struck by its engine. Hence it occurs to us that, so far as this colt is concerned, it is not a case of conflict in the evidence where we should be slow to disturb the verdict, but a case unsupported by evidence of facts essential to a recovery. If the evidence in this case will sustain defendant's theory as fully as it will plaintiff's, then clearly plaintiff must fail.''

Another decision pertinent in its facts to the matter now before us, also by the Supreme Court of Iowa, is that of Sullivan v. The W., St. L. & P. R. Co., 58 Iowa 602, 12 N. W. 620, 621. There the only disputed question of fact involved in an action for destruction of live stock was the place where the animal was killed. The defendant claimed that without conflict the testimony showed that the accident happened at a highway crossing. Plaintiff asserted that there was evidence tending to show that it occurred within a field where the railroad was not fenced. The trial court instructed the jury, that if they found the accident had taken place within the field, the plaintiff could recover without proof of negligence on the part of the defendant. A motion to set aside the verdict for plaintiff as in conflict with the evidence was overruled. Declaring that the motion should have been sustained, the appellate court said:

"The engineer who had charge of the engine drawing the train and two persons living in the neighborhood, who were near by, testify positively that the mare was upon the railway at the highway crossing when she was struck. All these witnesses saw the collision and the testimony of each is positive and direct.

"The plaintiff relies upon the circumstances that blood and marks upon the track were first seen within the field where the mare was found. This fact it is insisted tends to establish that the mare was struck in the field and not upon the highway crossing. There is no conflict between the testimony of the witnesses of the respective parties that

cannot be readily harmonized. The mare was found in the field about one hundred feet from the highway. Marks of blood and other indications of the accident first appeared about thirty-five feet from the crossing. These points were northwest from the crossing, the direction in which the train was running. In order to conclude that there is a conflict in the evidence, it must be admitted that indications of the accident would necessarily appear at the very point of the collision, and that it is not probable that the animal was borne thirty-five feet by the engine before leaving such indications. But this would be unreasonable. The direct testimony of the defendant, and the circumstances relied upon by plaintiff, may be readily reconciled without disregarding any evidence in the case. And this it was the duty of the jury to do. We conclude that there is not in the case what the law regards as a conflict of evidence, namely a difference that cannot be harmonized by the exercise of reason and in accord with the probabilities arising from the nature of the case.

"Counsel for plaintiff criticise the testimony of one or two of the witnesses who saw the accident, and point out statements which, they think, detract from the force of their testimony. It may be that counsel's strictures are just, but they do not reach all the witnesses who saw the accident, nor the important fact that all unite in stating the accident occurred upon the crossing."

However, the case most closely analogous in its facts to those at bar which has come under our notice is that of Blid v. Chicago & N. W. Ry. Co., 89 Neb. 689, 131 N. W. 1027. This action, as in the cases above cited, was one to recover damages for the death of live stock, in this instance alleged to have been caused by the defendant's failure to maintain lawful cattle guards at a highway crossing. The only question in the case was whether the evidence sustained the verdict in plaintiff's favor. That evidence, briefly outlined, was as follows:

The highway ran north and south at the place the cattle were killed and the railroad course across it was approximately east and west. Early in the day the cattle escaped from a pasture into the highway and were killed by an eastbound train about 11 A. M. Defendant's fences were

in good repair but the cattle guards were insufficient to turn live stock. In the afternoon plaintiff went to the scene of the accident and found the carcass of one animal about 60 feet east of the crossing at the bottom of the 6 foot fill upon which the railway was laid. He discovered the carcass of another several feet eastward at the bottom of the fill and on the other side of the grade. One hundred fifty feet further eastward the third injured animal was found. For 6 or 10 feet westward from the points where the carcasses lay, was found evidence that the bodies of the animals had been pushed or had slipped over the rails and the ties.

For the defense the fireman and the engineer in charge of the train testified positively that as the locomotive emerged from a cut at the end of a curve, the three animals were standing in the highway on the planks between the rails; that although the stock alarm was sounded and air brakes applied, it was impossible to stop the train and avoid a collision with the cattle, which occurred either right at the travelled way or between it and the cattle guards; that the bodies of the cattle were carried on the pilot over the cattle guard and beyond for a space until they rolled or fell off from the engine. The engineer testified that in his experience, bodies of cattle have been thus carried for one hundred yards before they would become disentangled and fall off. Two other witnesses testified there were no cattle tracks on the railway grade east, but that there were such tracks on the highway between the rails west of the cattle guards; that hair was found upon the cattle guards and occasionally eastward from there to the place where the carcasses were found, but no blood stains were observed over this distance. In rebuttal a witness for the plaintiff testified that he was familiar with the operation of railway trains and on three different occasions witnessed collisions between railroad engines and live stock and from his experience he did not believe that the three animals could

have been carried upon defendant's engine as testified to by the fireman and engineer.

At the close of all the evidence, a motion for a directed verdict was made, as in the case at bar. It was overruled. Holding that this ruling was error and reversing the judgment below, the appellate court said:

"The plaintiff contends that, although the sole eyewitnesses to the transaction testify that the cattle were in the highway at the time of the collision, the inferences that may logically be drawn from the facts and circumstances testified to by the other witnesses are sufficient to overcome the direct testimony which, it is argued, is so inherently improbable that the jury were justified in rejecting it, and that the verdict should not be disturbed.

"Circumstantial evidence may be received to establish a fact in contradiction to the positive testimony of alleged eyewitnesses to the transaction; but circumstantial evidence cannot be said to be sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such a nature and so related to each other that the conclusion reached is the only one that can fairly and reasonably be drawn therefrom. Asbach v. Chicago, B. & Q. R. Co., 74 Iowa, 248, 37 N. W. 182; Lopez v. Campbell, 163 N. Y. 340, 57 N. E. 501; American Freehold Land Mortgage Co. v. Whaley, (C. C.) 63 Fed. 743.

"The defendant's witnesses admit that one of its engines collided with the plaintiff's live stock. Does it reasonably appear by inference or otherwise that the collision occurred within the defendant's right of way and without the highway? The fact that no cattle tracks were found upon the railway grade between the points where the carcasses were found and the cattle guards, and that such tracks were found upon the grade within the highway, tends strongly to discredit the inference that the cattle voluntarily crossed the guards. The fact that the tracks were noticed on the grade and within the highway refutes the argument that the ground was so hard and dry that cattle would make no impression by walking thereon. The suggestion that the cattle may have entered the right of way at another crossing some distance eastward seems improbable in the light of all of the evidence. There is no proof that the cattle

guards at that crossing were out of repair or insufficient; there is no evidence that cattle tracks were found upon the grade east of the point where the carcasses were found; nor is there any evidence that the cattle ascended the grade within the defendant's right of way, but outside of the highway. The fireman and the engineer are the only persons having absolute knowledge of the facts, and we detect nothing improbable in their statements. The momentum of the train moving at the rate of 15 or 18 miles per hour was such that the plaintiff's cattle were as mere straws in the path of the train, and the locomotive in three seconds of time moved the 50 or 70 feet intervening between the point of collision and the points where the cattle rolled down the grade. It seems to us that every fact testified to by the plaintiff's witnesses is consistent with the testimony of the fireman and the engineer, so that upon a consideration of all of the evidence there is no substantial conflict therein. Unless the established facts from which the plaintiff deduces the fact that his cattle had crossed the guards before the collision cannot in reason be reconciled with the testimony of the engineer and that of the fireman, they do not contradict that testimony and will not sustain a verdict in the plaintiff's favor. As we have said, not only do those facts not contradict the direct testimony, but they are consistent therewith.''

As we view the evidence in the case now under consideration, it would appear quite as strong, if not stronger in some respects, for the defendant than that in the case last above reviewed. The testimony of four eye-witnesses that the cattle were struck on the highway crossing and not on the right of way, and that there were no cattle on the right of way as the train passed along, stands uncontradicted by any other witness who claimed to have observed the accident. Their testimony is not improbable or unreasonable. Plaintiff's own skilled witness established this, for he testified in effect that within his experience he had seen happen exactly the course of the accident as described by the train crew. Their testimony is not disputed by the physical facts and circumstances appearing in the case. On the contrary, these corroborate what the eye-witnesses re-

lated concerning the accident. Two of the injured cattle were undeniably found in the highway, immediately after the train was stopped. The south board wing fence next to the cattle guard was found knocked down and carried eastward upon the right of way. Two of the animals found dead upon the right of way were only about 30 feet and 70 feet respectively from the highway crossing and but a few feet from the rails; the other two were found on the track itself in the neighborhood of 117 feet from the cattle guard, some parts of their bodies being wedged in the frog. Blood, hair and flesh were seen on the east cattle guard, the teeth of which were badly bent. Traces of similar character were observed extending all the way from the cattle guard to the frog. Although there were plenty of cattle tracks seen on the highway crossing, there appear to have been none leading to where the dead animals were found on the right of way.

The testimony of plaintiff's skilled witness, that it would be nearly impossible to carry the cattle from the highway to where "they said the two was buried" (referring to the animals which were found at the frog), assuming it was properly admitted in evidence, might very well be so, for the proof is they were buried about 29 or 30 feet from the main track. The statement of the witness Foster, given for the first time on rebuttal, that he saw about 20 animals on the right of way, whether, as the record clearly reads, this was on the night before the accident, or, as is contended by respondent, this was on the night of the accident, must be considered in connection with the testimony of the Bullard beet dump boss, that he was out over the right of way at that place only twenty minutes before the accident and he knew of no cattle on the right of way that evening. Further, it seems that although the animals killed appear to have been part of a larger number, no cattle other than the four dead ones were ever found on the right of way subsequent to the accident.

As said in the case of Sullivan v. The W., St. L. & P. R. Co., supra, it was the duty of the jury to reconcile the direct testimony of the defendant and the circumstances relied upon by the plaintiff, if that could be done without disregarding any evidence in the case. That it was possible to do this, we have seen. Hence, we do not find here —adopting the language of Mr. Justice Beck in the decision just mentioned—a legal "conflict of evidence, namely a difference that cannot be harmonized by the exercise of reason and in accord with probabilities arising from the nature of the case." The motion of the defendant for a directed verdict should have been sustained.

As heretofore noted, appellant has argued a number of errors predicated upon certain rulings concerning the admission of evidence in the case and has directed our attention to many authorities supporting its position on these matters. Respondent has not endeavored to meet these contentions, either by argument or citations. While some of the points urged are so serious as would have required a reversal of the judgment in any event, since we entertain the views above expressed concerning the evidence in the case, it becomes unnecessary to additionally lengthen this opinion.

The judgment of the District Court is reversed, with instructions to enter judgment in favor of the defendant.

*Reversed.*

BLUME, C. J., and KIMBALL, J., concur.