Donald H. ALBRECHT and Jo Anne Albrecht, Appellants (Defendants),

v.

ZWAANSHOEK HOLDING EN FINAN-CIERING, B.V., a Netherlands corpora-tion; and Zwaanshoek Bouw–En Ex-ploitatiemaatschappij, B.V., a Nether-lands corporation, Appellees (Plain-tiffs).

No. 87–136.

Supreme Court of Wyoming.

Sept. 30, 1988 *.

Rehearing Denied Nov. 7, 1988.

* Case assigned 10–1–87; opinion circulated for    comment 12–15–87.

Frank Hess of Dill & Hess, Jackson, and Richard H. Floum and Greg David Derin of Dern, Mason & Floum, Los Angeles, Cal., for appellants.

Charles G. Kepler of Simpson & Kepler, Cody, Leo P. Larkin, Jr. of Rogers & Wells, New York City, and John A. Karaczynski of Rogers & Wells, Los Angeles, Cal., for appellees.

Before THOMAS, CARDINE, URBIGKIT and MACY, JJ., and O'BRIEN, District Judge.

MACY, Justice.

This is an appeal from a summary judgment foreclosing the mortgage on lands owned by defendants-appellants Donald H. Albrecht and Jo Anne Albrecht (Albrechts) given to secure the payment of a $2 million promissory note held by plaintiffs-appellees Zwaanshoek Holding En Financiering, B.V. (Zwaanshoek) and Zwaanshoek Bouw–En Exploitatiemaatschappij, B.V. (ZBE).

We affirm in part, reverse in part, and remand.

The Albrechts present the following issues on appeal:

A. Did the District Court commit reversible error in granting summary judgment to plaintiffs herein?

B. Did the District Court commit reversible error in vacating its order staying the underlying action to permit the trial of the antecedent California action?

C. Did the District Court commit reversible error in failing to grant defendants' motion to join MIG and its subsidiary MIG–USA as parties herein?

D. Is the $1,069,725.90, awarded by the District Court in its judgment purportedly as interest, truly interest or rather is it an impermissible penalty or forfeiture?

E. Was the record before the District Court sufficient to permit it to award plaintiffs $89,000 in attorneys' fees?

Sometime in 1980, Donald H. Albrecht, through his involvement with two California limited partnerships, Continental Investors, Ltd. and Continental/Tarzana Development Co., became a promoter of the Tarzana project, a condominium development venture in Tarzana, California. In order to finance the development, Albrecht arranged for a $24 million loan from Citicorp Real Estate, Inc. and Citibank National Association (collectively Citibank). As a condition of the loan agreement, Citibank required Albrecht or the limited partnerships to contribute at least $3.5 million of their own funds toward the project. Albrecht, as a general partner for Continental Investors, Ltd., obtained an additional $3.5 million loan from Zwaanshoek and ZBE, which was evidenced by two non-recourse, interest bearing promissory notes—one for $3 million and the other for $500,000. Each of these promissory notes was secured by a deed of trust on the Tarzana project properties with Citibank, as the primary lender, holding a priority lien.

Albrecht and the limited partnerships defaulted on the Citibank loan, and Citibank instituted foreclosure proceedings. However, on April 29, 1982, Albrecht entered into an agreement with Zwaanshoek and ZBE that restructured the debt obligations on the Tarzana project and enabled Albrecht and the limited partnerships to achieve a settlement with Citibank. Under that agreement, Zwaanshoek and ZBE assigned to Albrecht their $3.5 million promissory notes and related deeds of trust and loaned Albrecht an additional $1 million. In return, Albrecht provided Zwaanshoek and ZBE with a $1 million promissory note, which was secured by an irrevocable letter of credit issued by the Bank of America, and Donald H. Albrecht and Jo Anne Albrecht gave Zwaanshoek and ZBE a $2 million promissory note, which was secured by a mortgage on the Arbardee Ranch located in Teton County, Wyoming. The Albrechts also agreed, inter alia, that, during the month of October 1982, they would secure the release of a first mortgage on the Arbardee Ranch given to secure the payment of a promissory note they executed and delivered to W.B. Wells and Gladys H. Wells.

On November 1, 1985, Zwaanshoek and ZBE, believing that a breach of the agree-

ment had occurred on the part of the Albrechts, advised the Albrechts that they were in default in the performance of their obligations under the agreement and gave them thirty-one days in which to cure such default by paying off the promissory note secured by the Wells mortgage. The Albrechts failed to cure the default, and this action was commenced to foreclose the mortgage on the property securing the payment of the $2 million promissory note, which was accelerated pursuant to the terms of the agreement and promissory note. The Albrechts responded by filing a combined answer, counterclaim, and motion. The answer alleged numerous affirmative defenses, including lack of consideration, and that Zwaanshoek and ZBE were enjoined by a California court from proceeding with this action. The counterclaim in substance alleged that Zwaanshoek, ZBE, and others, collectively called the "Arab Group," made a fraudulent oral promise to invest several million dollars in the Albrechts' real estate projects to induce the Albrechts to deliver their $2 million promissory note to Zwaanshoek and ZBE. The motion alleged that Mediterranee Investors Group S.A. (MIG) and Mediterranee Investors Group–USA, Inc. (MIG–USA) are the parent companies of Zwaanshoek and ZBE and prayed that they be joined as indispensable parties under W.R.C.P. 13(h) and 19.

Initially, the court stayed the present action because of the prior order of the Superior Court of California, County of Los Angeles, enjoining Zwaanshoek and ZBE from foreclosing the promissory note and mortgage. However, after argument was heard, the court lifted that stay. Zwaanshoek and ZBE filed a motion for summary judgment, which was supported by a brief, affidavits, and exhibits. The Albrechts responded with a brief in opposition to the motion for summary judgment, supporting exhibits, and affidavits. After consideration, the court granted Zwaanshoek's and ZBE's motion for summary judgment, and Zwaanshoek and ZBE thereafter moved the

court to enter an order awarding costs and attorney's fees. On May 4, 1987, a final judgment was entered, and this appeal was taken.

## SUMMARY JUDGMENT

The Albrechts contend that the court committed reversible error in granting summary judgment to Zwaanshoek and ZBE because genuine issues of material fact did exist.

In *Fiedler v. Steger,* 713 P.2d 773, 774 (Wyo.1986), quoted in *Walters v. Michel,* 745 P.2d 913, 915 (Wyo.1987), we repeated our well-known general standards governing appellate review of summary judgments:

> A succinct and conclusive critique of the Wyoming summary-judgment law is afforded by the court in *Garner v. Hickman,* 709 P.2d 407, 410 ([Wyo.] 1985):
>
> "When reviewing a summary judgment on appeal, we review the judgment in the same light as the district court, using the same information. A party moving for summary judgment has the burden of proving the nonexistence of a genuine issue of material fact. Material fact has been defined as one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. Upon examination of a summary judgment, we view the record from the vantage point most favorable to the party opposing the motion, giving him all favorable inferences which may be drawn from the facts."

(Citations omitted.)

▰▰ The pleadings, affidavits, and exhibits of Zwaanshoek and ZBE clearly and unequivocally show that the Albrechts failed to timely secure the release of the Wells mortgage, that this failure triggered the acceleration of the payment of the $2 million promissory note pursuant to the terms of the promissory note and the agreement,[1] that the Albrechts failed to

---

1. After their action was commenced, the Albrechts failed to timely make an installment

payment on another promissory note secured by a second mortgage (Murray Mortgage) on

pay the promissory note, and that there was no promise by anyone in the Arab Group to invest in any of the Albrechts' other real estate projects.

The pleadings, affidavits, and exhibits presented by the Albrechts to oppose the motion for summary judgment on the theory that the $2 million promissory note was not supported by consideration because of fraudulent misrepresentations merely contain general allegations and conclusory statements of fraud. This Court has held that:

> The initial burden is on the movant to show that there is no genuine issue of material fact. Once that showing is made, it is incumbent upon the party opposing the motion to come forward with specific facts to show that there is a genuine issue of material fact.

*Stundon v. Sterling*, 736 P.2d 317, 318 (Wyo.1987), quoted in *Pace v. Hadley*, 742 P.2d 1283, 1285 (Wyo.1987) (citation omitted). General allegations and conclusory statements are not enough. *Jones Land and Livestock Co. v. Federal Land Bank of Omaha*, 733 P.2d 258 (Wyo.1987). Fraud must be established by clear, unequivocal, and convincing evidence and will never be presumed. *Duffy v. Brown*, 708 P.2d 433 (Wyo.1985).

The trial court correctly determined that there was no genuine issue of material fact and properly granted Zwaanshoek and ZBE summary judgment as a matter of law.

## VACATING STAY

■ The Albrechts assert that the trial court abused its discretion and committed reversible error when it vacated its order staying this action and disregarded an injunction filed in a preexisting action in the State of California. They contend that,

under the principles of comity and justice, the court should have stayed this case until the prior California case had been concluded. The Albrechts also allege that Zwaanshoek and ZBE are guilty of forum-shopping and misuse of jurisdictional resources.

In the most recent case of *Rivermeadows, Inc. v. Zwaanshoek Holding and Financiering, B.V.*, 761 P.2d 662, 668 (Wyo.1988), a case involving some of these same parties, we stated, quoting *Beach v. Youngblood*, 215 Iowa 979, 247 N.W. 545, 549 (1933):

> "It is a well and universally established principle that the disposition of real estate, either by deed, descent, or any other method, must be governed by the law of the state where the same is situated."

In that case, we also discussed other case law which uniformly established that the courts of one state do not have authority to order a foreclosure on mortgaged property located in another state. We see no reason why the logic used in *Rivermeadows, Inc.* and the cases cited therein should not apply here.

In this case, the property to be foreclosed is located in Teton County, Wyoming. The Wyoming court is the only forum where all the claims could be effectively litigated. The court did not abuse its discretion when it vacated its order staying the action.

## JOINDER OF PARTIES

■ The Albrechts allege that the court abused its discretion and committed reversible error when it denied their motion to join MIG and MIG–USA as parties to the action pursuant to W.R.C.P. 13(h) and 19.[2] They claim that the transactions between the Albrechts and Zwaanshoek/ZBE were

---

the Arbardee Ranch. This default also accelerated the payment of the $2 million promissory note. The trial court entered an order granting a motion to permit an amendment of the complaint to allege the default and found this default to also be a basis for entry of the summary judgment.

2. We note that, while there is no written order in the record denying the joinder motion, it was

de facto denied when the case was concluded by the entering of a final order and judgment without further discussion or appearance by those parties.

We also note that this issue is nearly identical to that argument asserted by Donald H. Albrecht and his Wyoming corporation, Rivermeadows, Inc., in the case of *Rivermeadows, Inc.*, 761 P.2d 662.

all negotiated by Donald H. Albrecht with MIG and MIG–USA as the parent companies of Zwaanshoek and ZBE.

W.R.C.P. 13(h) states:

Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.[3]

W.R.C.P. 19(a) provides:

A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

We stated in *Rivermeadows, Inc.*, 761 P.2d at 668:

This Court has long recognized the traditional definition of an indispensable party with regard to W.R.C.P. 19(a). In *American Beryllium & Oil Corporation v. Chase*, 425 P.2d 66, 68 (Wyo.1967) (quoting from *Amerada Petroleum Corporation v. Rio Oil Co.*, 225 F.Supp. 907, 910 (D.C.Wyo.1964)), quoted in *Reilly v. Reilly*, 671 P.2d 330, 332 (Wyo.1983), we stated:

"An indispensable party has been defined as one without whose presence before the court a final decree could not be made without either affecting his interest or leaving the controversy in such a condition that its final deter-

mination might be wholly inconsistent with equity and good conscience. Whether or not a person is an indispensable party cannot be determined by a prescribed formula because the facts peculiar to each case are determinative of that question."

(Citations omitted.) See also *Johnson v. Aetna Casualty & Surety Co. of Hartford, Conn.*, 608 P.2d 1299 (Wyo.1980).

MIG and MIG–USA are not indispensable parties to this action. Zwaanshoek's and ZBE's claims are solely on the bases of default on the $2 million promissory note and breach of the agreement to discharge the obligations of the promissory notes secured by the Wells and Murray mortgages. The Albrechts failed to show how either Zwaanshoek or ZBE defrauded them by its corporate makeup. The Albrechts apparently were aware that Zwaanshoek and ZBE were related and had the same parent companies. Although they were aware of these facts, the Albrechts chose to enter into transactions separately with Zwaanshoek and ZBE. MIG's and MIG–USA's participation was not required to resolve the claims, defenses, or counterclaim alleged in this case, and they are not indispensable parties. The court did not abuse its discretion in refusing the joinder of those parties.

## INTEREST

■ The Albrechts contend that the amount of $1,069,725.90 awarded as interest by the court in its judgment was not an award of interest but rather was an impermissible penalty or forfeiture. The Albrechts assert that their failure to discharge the obligations of the promissory notes secured by the Wells and Murray mortgages was only a "trival or technical" breach of the overall agreements made by the parties; therefore, the award of interest on the $2 million promissory note under the guise of equity amounts to an impermissible forfeiture or penalty. While we cannot agree with the Albrechts' reason-

---

**3.** Pursuant to our firmly established rule of law that questions not asserted at the trial court level and on appeal are not properly before this

Court, we decline to address W.R.C.P. 20 as it relates to this issue.

ing, we agree that the trial court improperly awarded interest to Zwaanshoek and ZBE.

In *Marcam Mortgage Corporation v. Black*, 686 P.2d 575, 580 (Wyo.1984), we stated:

> "The disposition of this case is controlled by *Younglove v. Graham & Hill*, Wyo., 526 P.2d 689 (1974), upon which Barker Brothers Company relies. In that opinion this court recognized the general proposition that forfeitures are not favored, as suggested by the Johnsons. The court concluded, however, that the general concept with respect to abhorrence of forfeitures does not justify a court of equity in disregarding and setting aside a valid contractual obligation of the parties in the absence of some particular equitable reason." *Barker v. Johnson*, Wyo., 591 P.2d 886, 889 (1979).

And:

> "If there is an express contract in connection with the damages, that contract, of course, must govern." *Studer v. Rasmussen*, 80 Wyo. 465, 344 P.2d 990, 998 (1959).

We have also recognized that:

> [T]he supreme court will not rewrite clear contracts. Nor will this court rewrite contracts under the guise of interpretation.

*Wyoming Machinery Company v. United States Fidelity and Guaranty Company*, 614 P.2d 716, 720 (Wyo.1980) (citation omitted). See also *Wyoming Recreation Commission v. Hagar*, 711 P.2d 402 (Wyo.1985) (quoting *Kuehne v. Samedan Oil Corporation*, 626 P.2d 1035 (Wyo.1981)). The $2 million promissory note provides in applicable part:

> Any breach by Maker, or by any party constituting Maker, as defined herein, of the terms or provisions of the Note Purchase Agreement or of the Mortgage, shall be deemed to be a default by Maker [of] the terms of this Note.
>
> * * * [A] default in the payment of any amount due hereunder may be cured within ten (10) days after the due date thereof by the payment of the amount so due. The outstanding principal balance hereof shall bear interest at the lesser of two (2) percent over the LIBOR Rate or the highest lawful rate per annum during the period in which this Note is in default. The LIBOR Rate shall be the six (6) month London Interbank Offered Rate as quoted to the London Branch of The Bank of America N.T. & S.A. at 11:00 A.M. London time on the date of default. The failure of Lender to exercise this option to accelerate the maturity of the principal sum hereof shall not constitute a waiver of such option, which option shall remain continuously in force.

It continues with respect to default, acceleration, and interest as follows:

> The whole of the principal sum of this Note shall immediately become due and payable, at the *option* of Lender, upon the failure of the Maker to pay any payment required hereunder within ten (10) days * * *. The *failure* of Lender *to exercise this option* to accelerate the maturity of the principal sum hereof shall not constitute a waiver of such option, which option shall remain continuously in force.

(Emphasis added.) It is clear from the plain and unambiguous language of the promissory note that, upon default, the lender had the option to accelerate payments and to declare the entire principal balance due and payable. Thus, the exercise of the option to accelerate payments would be the triggering event that would result in the promissory note bearing interest as provided.

On November 1, 1985, the lender mailed a letter concerning default to the Albrechts, which stated:

> Unless such default is cured by the payment in full to Mr. and Mrs. Wells, not later than thirty-one days after the date of your receipt of this letter, * * * Lenders *intend to accelerate* payment of the $2,000,000 promissory note * * *.

(Emphasis added.) However, the option to accelerate was never exercised. The letter of November 1, 1985, only expressed an "inten[t] to accelerate payment." Nevertheless, the trial court awarded summary

judgment to Zwaanshoek and ZBE, including interest on the $2 million promissory note in the amount of

> $1,057,363.01 computed at the rate of 11⅞% per annum from November 2, 1982 (the date of default) through April 15, 1987 * * *.

In *Mortgage Trust Co. of Pennsylvania v. Bach,* 69 Kan. 749, 77 P. 545, 545 (1904), a promissory note bearing interest at six and one-half percent per annum contained a provision that, upon default in payment, "the debt should immediately become due and payable, *at the option of the legal holder* thereof, and * * * should draw interest at the rate of 10 per cent." (Emphasis added.) The court stated:

> There was a default on July 1, 1902, and if the trust company had then exercised its option, and elected to declare the entire debt due, it would have been entitled to the increased rate. The option, however, was not in fact exercised until this action was begun. * * * That circumstance afforded the holder ground for accelerating maturity, but until it in fact exercised its option, and declared the debt due by reason of the default, the note was not mature, and it was not entitled to the higher rate of interest.

*Id.* at 546.

A no-interest bearing note in *Howell v. Ablah,* 188 Kan. 244, 361 P.2d 872 (1961), provided for ten percent interest upon nonpayment of any installment. With respect to default, the note provided that " 'all remaining installments shall at the option of the legal holder become immediately due and payable.' " *Id.* at 877. The court stated that "[p]laintiffs exercised their option to make payments under such note due and payable when they filed the instant action on February 10, 1958," *id.* at 877, and affirmed the decision of the trial court which was:

> "When the holder exercised his option and declared the note due and payable on February 10, 1958 by filing suit, the entire principal amount of the note became due and payable and should draw interest at the rate of 10% per annum from that date."

*Id.* at 877. See also Annotation, *Validity and effect of anticipatory provision in contract in relation to rate of interest in the event of default,* 12 A.L.R. 367 (1921).

We know of no reason why we should come to a different conclusion in this case than those conclusions drawn in the previously mentioned cases with essentially the same circumstances. We hold therefore that the trial court incorrectly awarded interest on the $2 million promissory note to Zwaanshoek and ZBE. Absent a declaration of acceleration, the interest did not begin to run until this action was commenced. Accordingly, we reverse the trial court's award of interest.

## ATTORNEYS' FEES

■ The Albrechts contend that the award of attorneys' fees in the amount of $89,000 must be overturned because there was no competent evidence to support the number of hours claimed or the hourly charge for the legal services rendered.

In *Jones Land and Livestock Co.,* 733 P.2d at 265, we acknowledged that:

> [T]here must be some evidentiary showing in order to make a determination of reasonable attorney's fees.

We have also recognized that:

> Reasonableness of an attorney's fee must always depend upon facts and circumstances of the litigation and *there must be some proof or evidentiary basis for determination of a reasonable attorney fee.* * * *
>
> *Evidence only of the amount of attorney fees normally awarded in cases involving the same type of claim is insufficient upon which to award attorney fees. A complete lack of evidence as to the value of attorney fees is likewise insufficient.*

*Anderson v. Meier,* 641 P.2d 187, 192 (Wyo.1982) (emphasis added and citations omitted).

The affidavit filed by Zwaanshoek's and ZBE's attorneys regarding their fees states as follows:

Plaintiffs have been charged in connection with the captioned case legal fees as follows:

Charged by Simpson & Kepler:

| | | |
|---|---|---|
| Legal services | $780.00 | |
| Out-of-pocket costs | 35.50 | $815.50 |

Billable hours charged by Rogers and Wells —890 hours

Examination of the record discloses that no other evidence was presented showing the hourly charge for the legal services rendered or the hourly rate charged by, or normally awarded to, attorneys in cases involving this type of claim. Likewise, there was no showing that the attorneys' fees charged were reasonable. We hold that the trial court erred when it awarded attorneys' fees to Zwaanshoek and ZBE, and we reverse the trial court's order in that regard.

Affirmed in part, reversed in part, and remanded to the trial court for entry of judgment in accordance with this opinion.

CARDINE, J., and O'BRIEN, District Judge, filed opinions concurring in part and dissenting in part.

THOMAS and URBIGKIT, JJ., filed dissenting opinions.

CARDINE, Justice, concurring in part and dissenting in part.

I dissent from the opinion of the court insofar as it reverses the award of attorney fees by the district court. The claimed attorney fees were never disputed. Appellees filed an affidavit setting forth the number of hours billed, and the court awarded attorney fees for those billable hours at the rate of $100 per hour. No counter affidavits were filed by appellants. The trial court had before it the record reflecting the very large amount of money involved in this case, the work performed, the manner in which it was done, the kind and complexity of the case, the skill required and the responsibility assumed, along with the affidavit of appellee. The hourly fee assessed by the court and ascribed to the hours for services rendered was reasonable. Where there is evidence to support the award and it is not disputed by the opposing party, we have said that this court should accord deference to the trial court's determination as to the amount of the fee. *State Surety Company v. Lamb Construction Company,* 625 P.2d 184, 189 (Wyo.1981).

The attorney fees, as awarded, should be affirmed.

O'BRIEN, District Judge, concurring in part and dissenting in part.

I concur in the opinion of the Court except for that section titled "INTEREST." The subject note bore no interest unless it was not timely paid, in which event the lenders could accelerate payment, and interest would accrue. The note was in default, but, instead of immediately declaring the default, the lenders gave an additional thirty-one days to cure. Although politely phrased, the intent of the November 1, 1985 letter was entirely clear—if the default was not cured within the new grace period, the note would be accelerated. The default was not timely cured; consequently, the note was due and started to accrue interest. By conditioning acceleration upon a second notice, which could do no more than reiterate what was previously said, the majority opinion distorts the plain meaning of language and frustrates the agreement of the parties.

THOMAS, Justice, dissenting.

I agree with those aspects of the majority opinion which hold that the district court could vacate the stay and proceed with the litigation on the foreclosure action. I also am in accord with the disposition of the claim for attorney fees and the claim for interest. I would, however, reverse the summary judgment.

I am not satisfied that the trial court properly entered summary judgment in view of the claims of the Albrechts with respect to fraud. I see the record much in the same way as Justice Urbigkit does. The affidavits submitted by the parties are conflicting and diametrically opposed on issues of fact which are material. The trial court appears to have ruled that corroborating evidence was required in addition to Donald Albrecht's personal testimony in order to satisfy the Albrechts' burden of

establishing the claims of failure of consideration and fraudulent misrepresentation by clear and convincing evidence.

Even though our rule of substantive law is that fraud must be established by clear and convincing evidence (*Duffy v. Brown*, 708 P.2d 433 (Wyo.1985)), that does not justify a trial court in ruling that evidence is not clear and convincing based upon its view of an affiant's or dependent's credibility. There appears to be no way that the trial court could have entered the summary judgment without making a determination as to Albrecht's credibility and without weighing the evidence. Those are processes which the trial court should eschew in addressing summary judgment.

The correct approach is articulated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), in which the Supreme Court said:

> "Our prior decisions may not have uniformly recited the same language in describing genuine factual issues under Rule 56, but it is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

The standard to be applied for that purpose is whether a reasonable juror could find the evidence sufficient to meet the clear and convincing standard; it is not the perception of the trial judge. I understand the decision of the trial court not only to incorrectly grant summary judgment, but also to bypass the directed verdict stage and to decide the case on its finding of fact without the benefit of testimony from witnesses, cross-examination, or the arguments of counsel.

Absent some compelling constitutional interest that requires protection, which is not this case, I am satisfied that the trial court should not enter summary judgment, even if the substantive rule of proof requires clear and convincing evidence, when it is confronted with diametrically opposing affidavits that otherwise would be sufficient to structure a genuine issue of material fact. It should leave for the finder of fact the weighing of the evidence and the assessment of credibility. In this case, the district court ruled otherwise and, consequently, I would hold, like Justice Urbigkit, that the summary judgment was not properly entered.

URBIGKIT, Justice, dissenting.

This case is correlative to *Rivermeadows, Inc. v. Zwaanshoek Holding and Financiering, B.V.*, 761 P.2d 662 (Wyo. 1988) (*Zwaanshoek I*), as that case was tried by a jury. With dissent in *Zwaanshoek I*, in part from court rejection of a portion of the jury verdict and decision, I again differ and dissent in this case (*Zwaanshoek II*), where the litigative resolution was denied total jury consideration.[1] Issues now differ by virtue of the summary judgment conclusion, even though the same general scenario in business dealing is factually presented. I would find error in fact and precedent in entry of summary judgment in favor of plaintiffs' (appellees) complaint and against defendants' (appellants) similar, but differentiated, counterclaim issues.

## SUMMARY JUDGMENT ON THE MERITS OF THE COMPLAINT AND COUNTERCLAIM

In preclusively determining the adequacy of argued issues of fact to deny summary judgment, the trial court, with extensively developed factual record, considered factual conflicts at a *Cordova v. Gosar*, 719 P.2d 625 (Wyo.1986) Stage Six. This is only to be done by considering movant's evidentiary burden of demonstrating no genuine issue of material fact exists, respondent's right to the benefit of reasonable doubt and to draw all favorable inferences form the record, and reflecting that credibility questions are to be resolved by trial. *Cordova*, 719 P.2d at 639–40. Considering the

---

1. This is not the only litigation with which these developments have been involved. See *Albrecht v. United States*, 529 F.Supp. 135 (D.Wyo.1981), rev'd 831 F.2d 196 (10th Cir.1987).

actual but complex and interlaced contentions developed in appellants' counterclaim, I do not find justification to conclude that the record is sufficiently barren or factually consistent to justify any summary judgment. Those contested issues, including not only fraud but also presented, although poorly documented, disingenuous transactional arrangements, cannot easily be separated within the proper confines of summary judgment unless this court will now countenance trial by affidavit. The benefit of trial testimony or jury review is simply not permitted. The broad scope of issues presented by this case cried to be tried, not shunted aside by summary judgment. *Greenwood v. Wierdsma,* 741 P.2d 1079 (Wyo.1987).

More justifiably, this court partially seems to apprehend the validity of its decision in generalized result—that it should affirm in the face of the heavily documented factual conflict by concluding that the real issue was failure of the pleadings to sufficiently state a claim. I cannot agree. This rationale accomplishes a juxtaposition of motion to dismiss, W.R.C.P. 12(b)(6), with an examination of the sufficiency of fraud pleadings to be direct and concise required by W.R.C.P. 8(e)(1) and 9(b). However, summary judgment under W.R.C.P. 56 and not a decision based on a pleading inquiry was actually entered in the face of a very exhaustive and conflicting record. Once material beyond pleading is received and considered, regression to the motion to dismiss is improper unless support for the pleading is absent in evidentiary conflict. Respondent is entitled to the benefit of the evidentiary support for his pleaded allegations. This majority's stance only convolutes cases for conversion to summary judgment, where here, a summary judgment record was converted to a motion to dismiss. *Torrey v. Twiford,* 713 P.2d 1160 (Wyo.1986). Previously and directly, the trial court considered this case on a summary judgment perspective by reviewing evidence and not pleadings; thus, the present affirmation by this court on any other basis is improper.

In this suit responding to Zwaanshoek, as the named plaintiff within the Arab Group (appellees), Donald Albrecht and Jo Anne Albrecht (appellants), as individuals, filed a nine page answer and counterclaim. Appellees' response to the counterclaim constituted a general denial with affirmative defenses of (1) failure to state a claim; (2) failure to state a punitive damage claim; (3) estoppel; (4) laches; (5) doctrine of clean hands; (6) waiver; (7) lack of reliance; (8) statute of frauds; (9) separately stating that appellants were barred, precluded and estopped by (a) availability of benefits; (b) underlying agreement performance; (c) inability to rescind and then restore parties to pre-agreement position; and continued by additional affirmative defenses of (10) lack of standing of Jo Anne Albrecht; (11) knowledge of corporate entities; and finally (12) adequate remedy at law.

No where in that *thirteen page reply pleading document* did appellees then, or by subsequent pleading later, contend that a failure of *pleadings* existed, and that appellants had not adequately presented their fraud allegations in the pleadings. Following complaint amendment, as not affecting appellants' nine page counterclaim or the appellees' thirteen page reply, the motion for summary judgment was pursued by appellees on its amended complaint and against the counterclaim based on "undisputed facts," which were then categorized and unitized within a *thirty-three page trial court brief, of which twenty-three and one-half pages involved generally contested factual recitations and contentions.*

After review of the extended record of five volumes including the initially submitted affidavits, the essential fact issue is presented of an expected on-going business arrangement constituting the essence of the entire transaction. This was in the contemplation of appellants to be the "consideration for the execution of the bail-out of the prior failed transaction" with which the parties had been involved.

In evidentiary support for summary judgment, the principal participant averred that he did not participate in, witness, nor did appellants tell him anything about an

anticipated on-going arrangement. Likewise, stated in inquiry denial, Lebanese citizen Fuad Siniora and Teton Land Title Company president Larry Monk added nothing by affidavit and information on the subject. Other affidavits by Muhammad Baasiri of Lebanon and property owner Helen Murray did not address the subject. Consequently, the only actual offered evidence on the litigated issue intrinsic to defense and counterclaim was addressed in behalf of the movant only by the affidavit of Mustafa Razian, a citizen of Saudi Arabia. As a director in the intrinsic Arab Group companies, Razian spoke with first-person knowledge as follows:

4. I did not initiate any of the proposals for the restructuring transaction. I understand that Donald H. Albrecht ("Albrecht") made those proposals to Peter Hausmann and others representing Zwaanshoek Holding and Zwaanshoek Bouw in early 1982 before I became involved in the discussions. I further understand that those proposals were the subject of correspondence among Peter Hausmann, Klaus Naude, Joseph El-Khoury, Lina Naaman and Albrecht.

5. I first became involved in the discussions concerning the restructuring transaction in early 1982. At that time I travelled to the United States to inspect the Tarzana project and to meet with Citibank representatives to discuss the steps that could be taken to preserve and protect the two notes aggregating $3.5 million held by Zwaanshoek Holding and Zwaanshoek Bouw. I met Albrecht for the first time during that trip.

\*      \*      \*      \*      \*      \*

9. I never told or represented to Albrecht that, if he agreed to the restructuring transaction, Zwaanshoek Holding, Zwaanshoek Bouw or any other member of the MIG group would enter into any new or future business transactions in the United States or elsewhere with Albrecht or that one or more of these companies would invest monies in transactions in the United States or elsewhere through Albrecht or his companies. It was not the purpose of my trip to California to consider any new investment opportunities for Plaintiffs or any other member of the MIG group. Furthermore, Albrecht never made any proposals through me to Zwaanshoek Holding and Zwaanshoek Bouw or to any other MIG group company for new business transactions after the restructing transaction. To my knowledge, Albrecht never presented any such proposals to Zwaanshoek Holding and Zwaanshoek Bouw or any other member of the MIG group.

10. Since the closing of the restructuring transaction on April 29, 1982, Albrecht has never discussed with or mentioned to me or, to my knowledge, to Zwaanshoek Holding, Zwaanshoek Bouw or any other member of the MIG gr[o]up any alleged representations, statements or premises concerning future business or investments of the MIG gr[o]up to be conducted or made through Albrecht or his companies.

11. I have reviewed the allegations of Albrecht's Answer and Counterclaims in this action regarding statements and representations purportedly made by me in connection with the restructuring transaction. Those allegations are contained primarily in paragraphs 21–31 of Albrecht's Answer and Counterclaims. I never made any such statements or representations to Albrecht or to anyone else, and those allegations are absolutely false.

What then, for the summary judgment motion response, did appellants provide? Affiant Donald Albrecht stated:

18. As a result of our unsuccessful negotiations with Citibank and the imminent foreclosure, Mr. Razian met with me and advised that Mr. Hariri did not wish to recognize the loss of the defendants' $3,500,000.00 investment. Mr. Razian then asked me if I would be willing to allow the defendants to go forward with a plan which they had conceived which would allow them to escape the impact of the loss. Mr. Razian acknowledged that the two "promissory notes" reflecting the defendants' $3,500,000.00 investment were clearly of no value as a

result of the pending Citibank foreclosure.

19. It was proposed that I "purchase" the two "promissory notes" and trust deeds. The purchase price would be $2,000,000.00 and would be reflected by my personal promissory note which would be secured by my interest in certain valuable real property and corporate securities, which were worth well in excess of $2,000,000.00. This would allow the defendants not to recognize the loss because on their books they would be able simply to recognize the "sale" of the "promissory notes." Such "purchase" was not only transparent due to the fact that the "promissory notes" were then valueless, but this entire transaction was contemporaneous with our agreeing to give the property to Citibank in lieu of foreclosure, part of which agreement required me in turn to transfer the two "promissory notes" and junior trust deeds which I had "purchased" to Citibank such that it obtained free and clear title unencumbered by the junior deeds of trust relating to the two "promissory notes." That this would be required was apparent, since my "purchase" was concurrent with the transfer to Citibank which would have to obtain precisely the same clear title which would result from foreclosure.

20. To induce me to go along with the defendants' plan, Mr. Razian made a number of representations. First was that the defendants would fulfill without question their obligations relating to the $1,000,000.00 financing of the Jackson Hole Project. I explained to Mr. Razian that the defendants were already so obligated. Mr. Razian then said that, in addition, and as the true consideration for my agreeing, was the defendants' promise (specifically Mr. Hariri or his controlled companies) that they would invest tens of millions of dollars in real estate projects in the United States through me. Mr. Razian said that Mr. Hariri was fabulously wealthy on a scale beyond that even dreamed of by the prior Arab owners. I was assured of continuing investments on such a huge scale and that such investments would generate the $2,000,000.00 necessary to satisfy my promissory note for my asserted "purchase" of the defendants' Tarzana Project "promissory notes," as well as at least an additional $1,000,000.00 to satisfy one last inducement.

\*　　\*　　\*　　\*　　\*　　\*

22. Simply stated, the only reason I participated in the defendants' scheme was as a result of Mr. Razian's promises to me that all of the defendants real estate investments in the United States would be only through me, that such investments would be in the magnitude of tens of millions of dollars, and would, at a minimum, be sufficient to generate net profits to me sufficient to pay back the $1,000,000.00 "loan" which would become due on May 1, 1985, so that the bank of America letter of credit would never be called upon, and also sufficient to pay back the $2,000,000.00 promissory note such that I would never have to pay it out of my other assets and such that my security would never be at risk.

23. However, and completely contrary to Mr. Razian's promises, the defendants never engaged in any additional investments with me, and they then breached their obligations to continue financing the Jackson Hole Project. This is detailed in Section 4, below.

*Section 4: The Defendants' Breach*

24. After inducing me to participate, the defendants never invested even a single additional dollar with me. Hence, all of the promised consideration never materialized, thus depriving me not only of such additional business, but also of the profits necessary to satisfy the $1,000,000.00 loan which becomes due on May 1, 1985, and the $2,000,000.00 promissory note which becomes due in 1990.

Essentially, no other pre-summary judgment evidence addressed the subject of the contended fraud in the inception, since other participants in behalf of the Arab Group did not lend weight to presented affidavit information. Equally in conflict on the issue of the fraud in the inducement, is sim-

ilar factual conflict of performance default by appellees in failure to advance the entire one million dollar commitment. There is no question in this record that the entire one million dollars to be loaned to appellants was not advanced. The record is in dispute as to nonpayment justification by appellees. If not justified, this was, as a matter of law, established to be a singularly significant default by appellees as a matter of fact. *Sagebrush Development, Inc. v. Moehrke*, 604 P.2d 198 (Wyo.1979); *Quin Blair Enterprises, Inc. v. Julien Const. Co.*, 597 P.2d 945 (Wyo.1979). See also *Western Plains Service Corp. v. Ponderosa Development Corp.*, 769 F.2d 654 (10th Cir.1985).

Essentially, one concludes from close reading of the summary judgment order and present majority decision that existence of issues of fact cannot be and were not denied, as essentially conceded by the summary judgment conclusion of the trial court in the statement:

> The consideration given by the plaintiff is adequate. The defendant has the *burden of proving fraud* by clear and convincing evidence and he has failed to satisfy this burden. Summary judgment should be granted and the plaintiff should be allowed to foreclose on the mortgage. [Emphasis added.]

This statement constitutes the most direct recognition of a weighed evidence disposition by summary judgment proceedings.

In further discussion, the trial court said:

> A fraud claim must be established by clear and convincing evidence. *Duffy,* [*v. Brown,* 708 P.2d 433, 437 (Wyo.1985) ] * * *. The party alleging fraud must do so clearly and distinctly and prove the same so as to satisfy the mind and conscience of its existence. *Reed v. Owen,* 523 P.2d 869 (Wyo.1974). The only evidence submitted by Albrecht on the issue

of fraud is his own declaration. This does not meet the clear and convincing evidentiary standard necessary to prove a claim of fraud.

The judgment of the trial court further stated:

> 17. Albrecht's fraud claim is governed by Wyoming law, which requires proof by clear and convincing evidence of each of the following five elements: 1) a false representation made by the defendant, 2) which is relied upon by the plaintiff, 3) to his damage, 4) the asserted false representation must be made to induce action, and 5) the plaintiff must reasonably believe the representation to be true. *Under Wyoming law, the party alleging fraud must do so clearly and distinctly and must prove the same* so as to satisfy the mind and conscience of its existence.
>
> 18. Albrecht failed to come forward with clear and convincing evidence to establish each of the elements of his fraud claim which, in essence, alleged that Plaintiffs induced Albrecht to enter into the April 29, 1982 Agreement by falsely promising to invest million[s] of dollars through Albrecht. Albrecht's fraud claim, which was premised solely upon an alleged vague oral promise not supported by a shred of documentary or other corroborative evidence, strains credulity.[2]
>
> 19. Plaintiffs and their affiliates (and their respective agents and representatives) did not make any misrepresentations of fact to Albrecht or his agents or representatives in order to induce Albrecht to enter into the April 29, 1982 Agreement. [Emphasis added.]

The character of the findings of the trial court cannot be justified in summary judgment where variant direct testimony con-

---

**2.** This statement is simply unsupported in this record. What the trial court actually says is that for whatever reason, in weighing the evidence, he chose to believe implicitly the Lebanese and Saudi Arabian witnesses and disbelieve the Albrechts, without listening to the actual testimony. A categorical, total, and actual weighing of the evidence was directly involved. Although at trial, absent jury participation,

weighing of evidence is intrinsic to decision, weighing in summary judgment may occasion validation by source rather than substance which is the principal reason for trials. Thus, disposition by summary judgment affidavits was made where the actual speaker was the attorney who composed the text, and searching cross-examination was denied.

flicts existed on critical issues. Obviously, the trial court tried a contested case in summary judgment decision by accepting one and rejecting another of two substantively detailed affidavits. This is a result that this court should not now countenance as unjustified by any past precedent or current logic. See W.R.C.P. 56 and a multitude of Wyoming cases. *Parker v. Haller*, 751 P.2d 372 (Wyo.1988).

With existence of issues of fact not really in doubt, this court now chooses to decide what was never considered by the trial court and is included here but not separately defined in the decision—the adequacy of the pleading to state a triable fraud case. Previously, I procedurally rejected this approach, and I also totally disagree substantively on this issue.

After pleading the failed California Tarzana project, appellants alleged:

22. The Arab Group then represented to Albrecht that, for internal reasons, it was undesirable for them to "recognize" the loss of their $3,500,000.00 investment in the Tarzana Project. The Arab Group then asked Albrecht if he would allow them to go forward with a plan conceived by them and their counsel which would allow the Arab Group not to recognize the loss of their $3,500,000.00 investment (i.e., the Tarzana $3,500,000.00 Notes).

23. The plan proposed by the Arab Group required Alb[r]echt to "purchase" the illusory and valueless Tarzana $3,500,000.00 Notes. Albrecht's "purchase" of Plaintiff's illusory and valueless Tarzana $3,500,000.00 Notes would be by way of the $2,000,000.00 Note secured by Albrecht's interest in certain valuable real property and corporate securities. For such "purchase" and in consideration thereof, the Arab Group promised to invest tens of millions of dollars in real estate projects in the United States with Albrecht and/or his affiliated companies.

24. In reasonable and justifiable reliance upon representations by the Arab Group that they would engage in future multi-million dollar business transactions with Albrecht and/or his affiliated com-

panies, Albrecht agreed to the Arab Group's proposition. The parties accordingly entered into a Memorandum of Agreement on or about April 29, 1982 (the "Memorandum"). The terms of the Memorandum were effectuated by voluminous complex documentation. The Memorandum and the related documentation collectively constitute the agreement which the Arab Group induced Albrecht to enter into their plan (the "April 29, 1982 Agreement").

25. The only consideration for Albrecht to enter into the April 29, 1982 Agreement was the representation by the Arab Group that they would engage in future multi-million dollar projects with him and/or his affiliated companies. The "purchase" of Plaintiffs' illusory and valueless Tarzana $3,500,000.00 Notes reflecting the loss of their $3,500,000.00 investment in the Tarzana Project was devoid of substance, since the Tarzana $3,500,000.00 Notes were neither intended as nor were they in fact true promissory notes not did they have any value.

26. After inducing Albrecht to enter into the April 29, 1982 Agreement, the Arab Group failed to engage in any additional investment with Albrecht or his affiliated companies.

The essential elements for determining whether fraud in the inducement was properly alleged are (1) false representation; (2) reliance; (3) asserted false representation made to induce action; and (4) belief of defrauded party that the representations were true. See *Garner v. Hickman*, 709 P.2d 407 (Wyo.1985) and *Duffy v. Brown*, 708 P.2d 433 (Wyo.1985).

Accepting customary rules of pleading and evidentiary consideration, it cannot be logically questioned within a sufficiency-to-state-a-claim perspective, or for that matter summary judgment, that the pleading in evidence sufficiently stated the second, third and fourth fraud elements. The controlling inquiry is whether, in fraud cases, (a) an intent to defraud must exist when the representation of future action is made, *Green Tree Acceptance, Inc. v. Doan*, 529 So.2d 201 (Ala.1988), or (b) later conduct

can be utilized as evidence of original intent. Conversely, this raises the "I didn't lie to you originally, since I only decided to cheat you later" defense. I do not accept this premise, either in morality, fraud pleading, or summary judgment inquiry. Wyoming has long recognized that intent can be inferred from subsequent action taken. *Cullin v. State*, 565 P.2d 445 (Wyo. 1977).

Appellants alleged that "[t]he Arab Group promised to invest tens of millions of dollars in real estate projects * * * with Albrecht," and that after inducing them by the incentive to enter into the agreement, the Arab Group subsequently failed to engage in any additional investment:

27. It was at all times reasonable and justifiable for Albrecht to rely upon the foregoing representations by the Arab Group and Albrecht had no reasonable means of ascertaining the Arab Group's true intent, which was that they never intended to honor their representations and only made them to induce Albrecht unwittingly to participate in their fraudulent scheme. The Arab Group's scheme was to transform their valueless lost equity investment in the Tarzana Project into either (a) the valuable $2,000,000.00 Note obtained from Albrecht, or (b) the valuable real estate and corporate securities securing said $2,000,000.00 Note, including the subject real property. In either case, Defendants would succeed in obtaining something valuable (e.g., valuable notes, real estate and/or corporate securities) for nothing (e.g., the valueless Tarzana $3,500,000.00 Notes), all as a result of defrauding Albrecht who would end up with nothing.

28. Public policy precludes allowing the Arab Group to succeed in their fraudulent scheme to victimize Albrecht by causing him to lose valuable assets to the Arab Group, thereby allowing the Arab Group fraudulently to convert their valueless lost investment in the Tarzana Project into valuable assets belonging to Albrecht.

\* \* \* \* \* \* .

30. The Arab Group's representations were made with the intent to induce Albrecht to rely upon them and to enter into the April 29, 1982 Agreement and related transactions, notwithstanding the Arab Group's true undisclosed intent not to perform any such representations.

It is a maxim that all evidence is to be weighed according to the proof which was within the power of one side to produce and in the power of the other to contradict. *Mammoth Oil Co. v. United States*, 275 U.S. 13, 51, 48 S.Ct. 1, 72 L.Ed. 137 (1927). Certainly circumstantial evidence is appropriate to prove the fraud elements. *United States v. Mammoth Oil Co.*, 14 F.2d 705 (8th Cir.1926). It must be recognized that a logically connected train of circumstances may be as cogent to prove the existence of a fact as any direct evidence and, indeed, may at times outweigh opposing direct testimony. *Tisthammer v. Union Pac. R. Co.*, 41 Wyo. 382, 286 P. 377 (1930). See *Claus v. Farmers & Stockgrowers State Bank*, 51 Wyo. 45, 63 P.2d 781 (1936). In discerning that issues of fact were to be tried by the jury, this court said in *Broom v. State*, 695 P.2d 640, 643 (Wyo.1985):

Circumstantial evidence, with proper inferences to be drawn therefrom, may be sufficient to establish fraud. *United States v. Mammoth Oil Co.*, 14 F.2d 705, 717 (8th Cir.1926), affirmed 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137 (1927).

Since it is impractical to look into a person's mind to ascertain his intention, it is necessary to consider surrounding circumstances. Since it is most difficult to prove intent by direct evidence, circumstantial evidence is necessary. The issue of actual fraud is commonly determined by recognized indicia, demonstrated badges of fraud, which are circumstances so frequently attending fraud; a concurrence of several will make out a strong case and be the circumstantial evidence sufficient to sustain a court's finding.

*Matter of Reed's Estate*, 566 P.2d 587, 590–91 (Wyo.1977).

It is noteworthy by logical pursuit of what is found in pleading and the record

that in the implicit counterclaim reply defense presented by the Arab Group of clean hands and high morality, the factual content of that defense was not a change in plans, but rather a direct dispute about the original understanding. Consequently, neither the trial court nor this court, as now by initial contemplation, can realistically examine this record without finding evidence of what actually occurred without considering the circumstantial proof which bears upon what initially was intended. Events provided more than a scintilla of confirming evidence of fraud. *Reynolds v. Mitchell,* 529 So.2d 227 (Ala.1988).

Without allowing trial, or perhaps even if trial had been held lacking contribution and evidence by several other persons directly involved in the negotiations, this court and third parties will not be able to accurately or even persuasively determine what happened. With this caveat, but in application of reasoned probabilities and known facts within a universe of a real world business dealings, the abject denial of appellees in this case of any agreement incentive to be derived from future business lacks conceivable credibility. Whether such contribution of the ultimate result was a future promise, puffing, idle conversation, or misunderstood nonpromissory discussion, it cannot be rationally discerned between the minimal contribution of this record of the "I didn't—you did" construction of the only two informing affidavits available.

Perhaps this ends in the recognition for jurists of what we know as laypersons, negotiators, and litigants who have been exposed with frequency to the syndrome and professional attitude sometimes otherwise ascribed as the "I never said anything that you can now prove unless I put it in writing" standard of business morality. On this record, I would leave resolution or determination of fact and extraction of falsity to the common composite good knowledge and commonplace wisdom of the trial jury. This is the most fundamental reason why trials by affidavit are not justified in our system of jurisprudence. By statement, the trial court chose not to believe Donald Albrecht and to believe Mustafa Razian. Reviewing exactly the same doc-

uments as the trial court, arriving at a singularly different conclusion in at least two regards, and perhaps factoring in a greater direct exposure to human conduct after business problems and failure, the record directs my conclusion that we should let the jury determine credibility as a matter of fact, and not do it as a matter of law through the judiciary.

I would reverse and remand for trial on the merits.